ROBERT A. CHAISSON, Judge.
li>On March 4, 2010, a Jefferson Parish Grand Jury returned an indictment charging defendant, Roger Chairs, with attempted second degree murder of Cary Smoot, in violation of LSA-R.S. 14:27:30.1 (count one), second degree murder of a known juvenile, in violation of LSA-R.S. 14:30.1 (count two), possession of a firearm by a convicted felon, in violation of LSA-R.S. 14:95.1 (count three), and obstruction of justice, in violation of LSA-R.S. 14:130.1 (count four).[1] At his March 12, 2010 arraignment, defendant pled not guilty. The matter proceeded to trial before a twelve-person jury on September 20, 2011. After considering the evidence presented, the jury, on September 23, 2011, found defendant not guilty on count one and guilty as charged on counts two, three, and four.
|sOn October 12, 2011, the trial court sentenced defendant to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence for the second degree murder conviction, twenty years at hard labor without benefit of parole, probation, or suspension of sentence and a fine of one thousand dollars for the possession of a firearm by a con *1236 victed felon conviction, and forty years at hard labor for the obstruction of justice conviction. From these convictions and sentences, defendant now appeals.

FACTS

On September 12, 2009, Cary Smoot, a neighborhood acquaintance of defendant, was in his vehicle leaving Advance Auto Parts on Airline Highway in Kenner, when Andre Preston exited a vehicle being driven by defendant, and shot at Smoot fifteen times.[2] Smoot’s vehicle was struck numerous times, causing it to stall. Smoot abandoned his vehicle, got into his friend’s vehicle that he had been following, and flagged down a police officer.
Officer Amanda Roh Dodt of the Kenner Police Department was on patrol at the time and stopped for Smoot. According to Officer Dodt, Smoot was “panicky” and told her that he had been shot. He removed his shirt, revealing a small wound on his back, which the officer did not believe to be a gunshot wound; nonetheless, she called for an ambulance. The paramedics examined Smoot, who had not been shot and was not seriously injured. Smoot advised the officer that two people were responsible: “Roger” and “Kareem,” and that the incident occurred near 10th and Fairway Streets in Kenner.
14At trial, Kirk McKenzie,[3] a neighborhood acquaintance of defendant and Preston, testified that defendant told him he was driving when his passenger, Preston, shot at Cary Smoot with an AK-47 on September 12, 2009.
Fourteen casings were recovered in connection with the September 12, 2009 shoot-mg. Ms. Jene Rauch, an expert in the field of firearm and tool mark examination, determined that all fourteen casings were fired from the same weapon and that the weapon could have been an AK-47. Projectile fragments were also recovered in connection with the shooting. These fragments, Ms. Rauch testified, could have been fired from an AK-47.
Detective Jeff Adams of the Kenner Police Department interviewed Cary Smoot on September 18, 2009. Smoot identified defendant, Andre Preston, and Kareem Nicholas as the perpetrators. On October 5, 2009, Detective Adams met again with Smoot to present him with photographic lineups. Smoot reviewed three lineups and identified defendant, Preston, and Nicholas. Based on this information, Detective Adams obtained arrest warrants for all three individuals.
On the evening of November 7, 2009, prior to the arrests of defendant and Preston, Smoot passed by the Jesse Owens playground in River Ridge, where he saw his cousin Louis with two individuals, Calvin Bardell and Ernest Pollard. In the early morning hours of November 8, Smoot, visiting his girlfriend on Bengal Road in River Ridge, heard gunshots. Concerned for his cousin, he immediately called Louis, who told him that he was being shot at by Preston and defendant. Smoot called Preston, and defendant answered the phone. Smoot asked defendant, “Why y’all shooting at my cousin?” Defendant responded that if he wanted Louis dead, he would have killed him right there while they were shooting.
*1237 |;¡At trial, Ernest Pollard and Calvin Bardell[4] testified about what occurred in the late evening hours of November 7 and the early morning hours of November 8. According to Pollard, on November 7, 2009, around 10:00 or 11:00 p.m., he was outside a club looking to purchase narcotics when defendant pulled up. Pollard asked defendant if he had any narcotics, to which he responded, “Hop in the car. I probably have something for you to do.” When Pollard got in the car, he noticed that defendant had possession of a machine gun, a MAC-11. Defendant then dropped Pollard off at his house in River Ridge.
While there, a vehicle containing Calvin Bardell, Louis Smoot, and Brandon Watson pulled up and asked Pollard if he could help steal some rims off a car. Pollard, thinking he would get narcotics in return, agreed to assist. The four men drove around looking for rims until they stopped near the Jesse Owens playground. Calvin Bardell was driving the vehicle, Louis Smoot was in the front passenger seat, Watson was seated behind Bardell, and Pollard was seated behind Smoot. While there, a vehicle pulled up behind them, which Pollard recognized as the vehicle he had ridden in earlier with defendant. Pollard recognized the occupants of the other vehicle as defendant, Andre Preston, Samuel Baker, and Joshua Moss. As soon as the vehicle pulled up, Louis Smoot reclined his seat and told Bardell to drive off. Andre Preston, the driver, and defendant then started asking who was in the front seat next to Bardell. Moments later, Bar-dell drove off, and Preston’s vehicle followed. At this point, the occupants of Preston’s vehicle started “shooting wild.”
After the shooting had stopped and both vehicles had gone in different directions, Pollard spoke with Samuel Baker[5] on the phone, who told Pollard, “That wasn’t meant for you.” While on the phone with Baker, Pollard heard defendant in |fithe background saying something to the effect that he wanted to “shoot ‘em up” in the vehicle. The next day Pollard encountered defendant, Baker, and Moss, and defendant told Pollard, “Man, you know that wasn’t meant for y’all, you know. It was something dealing with, you know, Louis and them.” He went on to say, “Man, just don’t say nothing, you know. Keep your mouth shut.”
According to Calvin Bardell, in the early morning hours of November 8, 2009, he was driving a vehicle with passengers Louis Smoot, Brandon Watson, and Ernest Pollard near the Jesse Owens playground looking to purchase marijuana. Another vehicle, driven by Andre Preston with defendant as a passenger in the back, pulled up behind Bardell’s vehicle.[6] Preston and defendant began asking Bardell who was in the front seat next to him. Bardell then noticed a gun in the back of the other vehicle. Alarmed, he decided to leave, and as he drove off, he heard approximately fifteen gunshots. Later, Bardell, along with Watson, encountered defendant, who told Bardell, “That wasn’t for you.” Bar-dell interpreted defendant’s statement to *1238 mean that the gunfire the previous night was not intended for him.
That same night, at a nearby apartment complex, a seven-year-old girl, P.D., was struck and killed by a stray bullet. Timothy Williamson, P.D.’s stepfather, testified that at the time of P.D.’s death, he was married to and living with P.D.’s mother and P.D. in an upstairs apartment in the Mark Twain apartment complex on Jefferson Highway in River Ridge. On the evening of November 7-8, 2009, all three were at home, along with P.D.’s cousin, who was spending the weekend there. That night, P.D. and her cousin were sleeping in the living room on an air mattress. Williamson and his wife retired to bed around 11:00 or 11:30 p.m., but 17he was awakened in the middle of the night by “a voice.” He entered the living room, turned on the lights, and saw P.D. lying on the air mattress with her cousin standing next to her. The cousin told Williamson that she did not know what happened, but that P.D. yelled out in her sleep. Williamson then noticed blood on the air mattress and called P.D.’s mother into the room. P.D.’s mother took P.D. into the bathroom where she noticed a hole in her neck. At this point, Williamson called 911. Police and medical personnel responded to the scene, but they were unable to save the child.
Dr. Karen Ross, a forensic pathologist for the Jefferson Parish Coroner’s Office and an expert in the fields of forensic medicine and forensic pathology, performed the autopsy on P.D. and concluded that she died as a result of a gunshot wound to the neck. Dr. Ross also testified that the gunshot wound sustained by the victim was consistent with a bullet passing through another object, such as a wall, before striking her.
On November 9, 2009, Deputy Derrick McGee of the Jefferson Parish Sheriff’s Office was investigating the murder of P.D. To try to get information about the murder, Deputy McGee sent messages to all his informants. Cary Smoot contacted the officer and told him that Andre Preston and defendant were shooting at his cousin Louis. Smoot subsequently gave four statements regarding his knowledge of the incident.[7]
Then, on November 10, 2009, the police learned that Preston was renting a motel room located on Veterans Boulevard in Kenner. Pursuant to the arrest warrant, Preston was arrested at this location. Detective Adams then obtained a |ssearch warrant for the motel room. As a result of that search, the police seized a 9 mm Glock handgun, a Springfield Armory .45 caliber handgun, a 9 mm Glock magazine, 9 mm cartridges, and .45 caliber bullets. A search warrant was also executed at defendant’s residence in Kenner, but nothing was seized. However, defendant was arrested that day pursuant to the arrest warrant.
On November 10, 2009, defendant, who was in custody in connection with the attempted second degree murder of Cary Smoot, was advised of his rights in connection with the second degree murder of P.D. Defendant executed a rights of arres-tee form, waived his rights, and indicated *1239 he was willing to give a statement. Defendant did not give a taped statement, but verbally told Detective Beavers, “I should tell you what happened, but I can’t; but I didn’t mean for that little girl to die. It was just a stupid mistake.”
Thereafter, on November 19, 2009, Kirk McKenzie met with Detective Brett Beavers of the Jefferson Parish Sheriffs Office and gave a statement about a conversation he had "with defendant and Preston on November 8. According to McKenzie, around 10:00 or 11:00 p.m. on November 8, he encountered defendant and Andre Preston. Defendant told McKenzie about the shootout he and Preston had with Louis Smoot the night before and that he had used a MAC-11. He also told McKenzie, “I think a little girl had got killed. I think I’m the one that did it.” Preston told McKenzie that he was firing a weapon too, a Glock.
Scott Davis, a maintenance worker at the KOA Campground on Jefferson Highway in River Ridge, approximately one block away from the Mark Twain apartments, testified that in the early morning hours of November 8, 2009, he heard numerous gunshots. The campground is equipped with surveillance cameras, some of which have audio capability. Davis contacted the police after he reviewed some surveillance footage and discovered that one of the cameras | .¡captured an audio recording of gunfire. The time/date stamp on the surveillance footage indicates the gunfire occurred at 4:12 a.m. on November 8, 2009.
Thirteen casings were recovered within an approximate 250-foot range on South Upland Avenue — between 328 and 228 Upland Avenue.[8] Ms. Jene Rauch, the firearm expert, testified that twelve of these casings were similar, while one was not. The dissimilar casing was determined to be from a Glock, while the twelve similar casings, Ms. Rauch opined, could have been fired from a MAC-11. Moreover, Colonel Timothy Scanlan, the director of the Jefferson Parish Sheriffs Office Crime Lab and an expert in the fields of firearm and tool mark analysis, bloodstain pattern analysis, and crime scene reconstruction, testified that, based on the locations of the casings at the scene, the round fired from the Glock was consistent with having been fired from the driver’s side of a vehicle, while all the other rounds were consistent with having been fired from the passenger side of a vehicle.
In addition to these thirteen casings, eight projectiles, or fragments of projectiles, were recovered — seven from the Mark Twain apartment complex, and the eighth from the victim’s body. Ms. Rauch testified that six of these projectiles, including the one recovered from the victim’s body, were all fired from the same weapon, which could have been a MAC-11. Regarding the remaining two projectiles, Ms. Rauch testified that due to the damage sustained to them, she was unable to determine whether they were fired from the same weapon as the others. However, she did determine that they were of the same class as the six other projectiles and that they could have been fired from a MAC-11. Ms. Rauch determined that none of the eight projectiles recovered were fired from the Glock handgun.
| ^Colonel Scanlan testified that the bullet responsible for P.D.’s death passed through the wall of her apartment, passed over her cousin who was sleeping next to her, and struck P.D. With the aid of diagrams, Colonel Scanlan explained that the trajectory of this bullet was consistent *1240 with the weapon of origin being discharged on Upland Avenue. Furthermore, Colonel Scanlan testified that the fatal bullet was consistent with having been fired from a weapon that was not recovered; it was not fired from the dock.
Ms. Bonnie DuBourg, the senior DNA forensic analyst of the Jefferson Parish Sheriffs Office and an expert in the field of forensic DNA analysis, obtained a DNA sample from the dock handgun and determined that Preston could not be excluded as a possible donor. Additionally, Preston could not be excluded as a possible donor of the DNA profile found on the dock 9 mm magazine.
In addition to ballistics evidence, a black White Sox baseball cap was found in the middle of the street in front of 301 South Upland Avenue. Based on the DNA sample obtained from this cap, Ms. DuBourg concluded that neither defendant nor Joshua Moss could be excluded as possible donors.

ASSIGNMENT OF ERROR NUMBER ONE

In his first assignment of error, defendant contends that the trial court erred in denying his motion to quash the indictment as constitutionally deficient.
On August 29, 2011, defendant filed a motion to quash the indictment alleging that the short form indictment used by the State was defective because it failed to charge the requisite elements of second degree murder. In particular, defendant claimed that the indictment failed to specify whether the prosecution was under LSA-R.S. 14:80.1(A)(1), which would require specific intent to Mil or inflict great bodily harm, or under LSA-R.S. 14:30.1(A)(2), which would require |nthat the offender be engaged in the perpetration or attempted perpetration of an enumerated felony offense. On September 8, 2011, the motion to quash was denied by the trial court.
Article I, § 13 of the Louisiana Constitution requires that an indictment inform a defendant of the nature and cause of the accusation against him. State v. Page, 08-531 (La.App. 5 Cir. 11/10/09), 28 So.3d 442, 453, writ denied, 09-2684 (La.6/4/10), 38 So.3d 299. This requirement is implemented by LSA-C.Cr.P. art. 464, which provides:
The indictment shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged. It shall state for each count the official or customary citation of the statute which the defendant is alleged to have violated. Error in the citation or its omission shall not be ground for dismissal of the indictment or for reversal of a conviction if the error or omission did not mislead the defendant to his prejudice.
LSA-C.Cr.P. art. 465 authorizes the use of specific short form indictments in charging certain offenses, including second degree murder.[9] The Louisiana Supreme Court has consistently upheld the constitutionality of these short forms. State v. Draughn, 05-1825 (La.1/17/07), 950 So.2d 583, 624, cert. denied, 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007).
In State v. Page, supra, the defendant was convicted of second degree murder and on appeal argued that his indictment was constitutionally defective because it failed to meet the requirements of LSA-C.Cr.P. art. 464, and it did not adequately notify him of the charges against him. His indictment read in pertinent part: “David *1241 Page ... on or about the 4th day of January in the year of our Lord, Two Thousand and Seven ... violated 14:30.1 in that [he] did commit second degree murder of Mo-neir Gindy.” This Court concluded that the short form indictment used by the State was sufficient to give the defendant notice of the | ^charges against him. In reaching this conclusion, this Court noted that the indictment conformed to the short form provided in LSA-C.Cr.P. art. 465(A)(32) and that the defendant was provided with ample discovery which included, among other things, police reports, arrest warrants, probable cause affidavits, statements of the defendant and his co-defendant, and statements of three key State witnesses.
Likewise, in the instant case, the indictment complied with the short form in LSA-C.Cr.P. art. 465(A)(32) as it provided: “... on or about the 8th day of November, 2009, the said ROGER D. CHAIRS ... violated R.S. 14:30.1 in that [he] did commit second degree murder of a known juvenile (DOB 4/29/2002).” Moreover, when a short form indictment is used, it is intended that the defendant use a bill of particulars to procure details as to the statutory method by which he committed the offense. State v. Page, 28 So.3d at 453. On March 25, 2010, defendant filed a motion for bill of particulars, discovery, and inspection. In response, the State provided to the defense, among other things, police reports, arrest warrants, search warrants, crime lab reports, and statements of witnesses and co-defendants. As such, defendant was fully aware of the nature of the charges against him.
Accordingly, we find no abuse of discretion in the trial court’s denial of defendant’s motion to quash the indictment.[10]

ASSIGNMENT OF ERROR NUMBER TWO

In his second assignment of error, defendant maintains that the trial court erred by allowing two co-defendants, Joshua Moss and Samuel Baker, to assert their Fifth Amendment right not to testify in the presence of the jury.
11sOn September 16, 2011, the State filed motions to compel Joshua Moss and Samuel Baker to testify at defendant’s trial pursuant to LSA-C.Cr.P. art. 439.1. On September 19, 2011, the trial court granted the motions, compelling the testimony and granting immunity as follows: “any information directly or indirectly derived from [the compelled testimony] shall not be used against [the witness] in any criminal case except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the Order.”
During trial, Joshua Moss, outside the presence of the jury, took the stand, and his attorney advised him of the options that he had in regard to testifying as well as the possible consequences of both testifying and not testifying. In response to questioning by his attorney, Moss indicated his intent to “plead the Fifth.” The trial court then advised Moss that due to the grant of immunity, he did not have a Fifth Amendment right against self-incrimination and must testify. Moss nonetheless stated that he would invoke his Fifth Amendment right not to testify.
The jury thereafter returned to the courtroom, and the State began questioning Moss. Moss answered a few questions relating to his age, his marital status, and his current housing. Pursuant to further *1242 questioning by the prosecutor, Moss advised the court that he knew Samuel Baker, Roger Chairs, and Andre Preston. Having ascertained Moss’s relationship with these individuals, the State then asked: “Were you in a car with Andre Preston, Roger Chairs and Samuel Baker on Upland Street back in November of 2009, the night that a little girl got killed?” Moss refused to answer the question even though the court ordered him to do so. The prosecutor again asked Moss: “Well, were you in a car with Andre Preston, Roger Chairs and Samuel Baker at a time when you ran into Calvin Bardell, Louis Smoot, Ernest Pollard and Brandon Watson sitting in another car?” At this point, Moss replied: “I don’t remember. I know I wasn’t home.” When the |Meourt then informed him that he had to speak louder, Moss replied that he was not answering the question. The court then ordered Moss to answer the question. Moss again refused to answer despite the threat of being held in contempt.
Samuel Baker also took the stand in the presence of the jury. After being sworn in, the prosecutor asked Baker his age. Baker responded, “I plead the Fifth.” The court advised Baker that he did not have a Fifth Amendment right against self-incrimination because he was granted immunity. The prosecutor then asked Baker his age to which Baker replied, “I ain’t answering no questions.”
At trial, defense counsel objected to these witnesses being allowed to assert their Fifth Amendment privilege against self-incrimination in the presence of the jury on the basis that it was prejudicial to defendant. On appeal, defendant contends that he was prejudiced because he was denied his right to confront and cross-examine his accusers. In particular, defendant asserts that because the State informed the jury during opening statement that the two co-defendants would testify under immunity and they asserted their refusal to testify in front of the jury, it was impossible for the defense to cross-examine them on their implied participation in the shooting. Defendant further points out that he was prejudiced because the non-verbal communications by the co-defendants constituted inadmissible hearsay that identified defendant as a participant in the shooting.[11]
The privilege against self-incrimination granted by the Fifth Amendment to the United States Constitution is also assured by Article I, § 16 of the Louisiana Constitution (1974), which provides that “No person shall be compelled to give evidence against himself.” The jurisprudence favors the determination of claims |15of privilege outside the jury’s presence, considering the undue weight a jury might give to such a claim. State v. Laviolette, 06-92 (La.App. 5 Cir. 9/26/06), 943 So.2d 627, 535, writ denied, 06-2585 (La.5/18/07), 957 So.2d 149. In addressing the issue of whether it is permissible to allow a witness to assert his Fifth Amendment privilege in the presence of the jury, Louisiana courts have consistently held that it is improper conduct for either the prosecutor or the defense to knowingly call a witness who will claim a privilege for the purpose of impressing upon the jury the fact of the claim of privilege. State v. Berry, 324 So.2d 822, 830 (La.1975), cert. denied, 425 *1243 U.S. 954, 96 S.Ct. 1731, 48 L.Ed.2d 198 (1976); State v. Gerard, 96-366 (La.App. 5 Cir. 11/14/96), 685 So.2d 253, 258; State v. Laviolette, supra at 535; State v. Smith, 96-261 (La.App. 3 Cir. 12/30/96), 687 So.2d 529, 543, writ denied, 97-314 (La.6/30/97), 696 So.2d 1004.
In Namet v. United States, 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963), the Supreme Court recognized that no jurisprudence suggests that reversible error is invariably committed whenever a witness claims his privilege not to answer in the presence of the jury. The Supreme Court then conducted a two-fold inquiry to determine if the trial court committed reversible error in allowing prosecutors to ask two witnesses incriminating questions concerning their relationship with the defendant, although it was known that the witnesses were going to claim their privilege against self-incrimination. First, the Court looked for prosecutorial misconduct, i.e., did the government make “a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege.” Second, the Court considered whether “inferences from a witness’ refusal to answer added critical weight to the prosecution’s case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant.” Namet v. United States, 373 U.S. at 186, 83 S.Ct. at 1154-1155.
| lfiApplying the Namet analysis, we find nothing in the record to indicate that the State made a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege. To the contrary, it appears that the district attorney, as well as the trial court, believed that Moss and Baker could not assert a Fifth Amendment right against self-incrimination because they were compelled to testify and granted immunity pursuant to LSA-C.Cr.P. art. 439.1. Moreover, lack of prosecutorial misconduct is further shown by the prosecutor’s assertions in the opening statement that he had never spoken to Moss or Baker, that they were being forced to testify pursuant to a grant of immunity, and further that he did not know what these individuals would say or whether they would even speak once they were called to the witness stand. Hence, we find no evidence of prosecutorial misconduct.
Second, we do not find that Moss’s and Baker’s assertion of their right not to testify added critical weight to the State’s case in a form not subject to cross-examination. At trial, other witnesses, who were subject to cross-examination, testified about the individuals present and the events that occurred on the night of the shooting. Ernest Pollard testified that on November 7, 2009, at about 10:00 or 11:00 p.m., he got into defendant’s car to go find some narcotics. At that time, he noticed that defendant had possession of a machine gun, a MAC-11. Defendant dropped Pollard off at home, and Pollard later got picked up by a vehicle containing Calvin Bardell, Louis Smoot, and Brandon Watson. The four men were near the Jesse .Owens playground when a vehicle pulled up behind them. Pollard recognized the vehicle as the one he had ridden in earlier with defendant. He also recognized the occupants of the vehicle as defendant, Andre Preston, Samuel Baker, and Joshua Moss. As soon as the vehicle pulled up, Louis Smoot reclined his seat and told Bardell to drive off. Andre Preston, the driver, and defendant then |17started asking who was in the front seat next to Bardell. Moments later, Bardell drove off and Preston’s vehicle followed. At that point, the occupants of Preston’s vehicle started “shooting wild.”
Calvin Bardell also testified at trial about the night of the shooting. Bardell *1244 corroborated Pollard’s testimony that a vehicle, being driven by Preston and with defendant as a passenger, pulled up behind Bardell’s vehicle. Preston and defendant began asking Bardell who was in the front seat. Bardell then noticed a gun in the back of the other vehicle. Alarmed, he decided to leave, and as he drove off, he heard approximately fifteen gunshots.
Cary Smoot also testified that he saw his cousin Louis, Calvin Bardell, and Ernest Pollard at the Jesse Owens playground. Later, in the early morning hours of November 8, he was at his girlfriend’s house when he heard gunshots. Concerned for his cousin, he immediately called Louis who told him that he was being shot at by Preston and defendant. Cary Smoot then called Preston, and defendant answered the phone. When Smoot asked defendant why they were shooting at his cousin, defendant replied that if he had wanted Louis dead, he would have killed him while they were shooting.
In addition, there was testimony from Kirk McKenzie that defendant told him about the shoot-out and also told him, “I think a little girl got killed. I think I’m the one that did it.” According to Detective Beavers’ testimony, defendant verbally told him, “I should tell you what happened, but I can’t; but I didn’t mean for that little girl to die. It was just a stupid mistake.”
Given all of the other testimony that was introduced at trial regarding defendant’s participation in the shooting, we cannot say that the inferences from the witnesses’ refusal to answer added critical weight to the prosecutor’s case in a form not subject to cross-examination.
| ^Accordingly, having applied the twofold inquiry utilized in Namet v. United States, supra, we find that the trial court did not commit reversible error in allowing Baker and Moss to assert their right not to testify in front of the jury.

ASSIGNMENT OF ERROR NUMBER THREE

In his third assignment of error, defendant challenges the trial court’s denial of his motions for mistrial. In particular, defendant claims that the trial court erroneously denied his motion for mistrial on four occasions: (1) when the prosecutor improperly called into question defendant’s right to remain silent and not give a taped statement; (2) when Giglio material concerning Kirk McKenzie was not given to the defense; (3) when an emotional display by the district attorney’s victim assistance coordinator created a disturbance during the trial; and (4) when improper references were made to other crimes evidence.
A mistrial is a drastic remedy and is warranted only when trial error results in substantial prejudice to defendant that deprives him of a reasonable expectation of a fair trial. Whether a mistrial should be granted is within the sound discretion of the trial court, and the denial of a motion for mistrial will not be disturbed absent an abuse of discretion. State v. Pierce, 11-320 (La.App. 5 Cir. 12/29/11), 80 So.3d 1267, 1271.

Prosecutor’s Reference to Defendant’s Post-Arrest Silence

Defendant first argues that the trial court erred in denying his motion for a mistrial based upon a violation of Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).[12] Defendant contends *1245 that the prosecutor impermissibly elicited testimony from Detective Brett Beavers regarding defendant’s right to silence. 119Puring the direct examination of Detective Beavers, the following dialogue occurred:
Q: Did you ultimately speak to Mr. Chairs?
A: Yes, sir.
Q: Did he give you a taped statement?
A: No, he did not.
Q: Did you wish to take a taped statement from him?
A: Yes, I did.
Q: Was he willing to give you a taped statement?
A: No. No, sir.
At this point, defense counsel moved for a mistrial, which the trial court denied. During the bench conference, the prosecutor explained his line of questioning was designed to respond to remarks in defense counsel’s opening statement regarding the absence of a taped statement from defendant. In his opening statement, defense counsel offered the following:
The evidence is going to show you that these detectives were pretty thorough. Here’s a binder. Half of this binder is filled with statements that were taken by the detectives in investigating this case. What they didn’t get is — what they didn’t get a — in these statements, by the way, these are recorded statements, and then they’re transcribed, and we have all of those transcribed statements. By law, we’re entitled to them, and we were given those statements by the prosecution. The one recorded statement they don’t have is a recorded statement from Roger Chairs, the Defendant.
But lo and behold, the State is going to present a detective who’s going to say, ‘Well, he didn’t want to give a statement, but he mentioned something.” And you’re going to hear what that is. But question why these detectives are so thorough, why the evidence is not going to show you any taped statements from Roger Chairs.
The Louisiana Supreme Court confronted a similar factual scenario in State v. Bell, 446 So.2d 1191 (La.1984). In that case, the defendant had been convicted of forgery and on appeal argued that the trial court erred in not granting a mistrial hnwhen the prosecutor referred to the defendant’s post-arrest silence. During a detective’s testimony about the investigation and the defendant’s arrest, the following exchange took place:
Q: And, after he was brought to the Sheriffs office, what did you do?
A: I asked him if he wanted to make a statement, and he refused.
Q: Did he at any time tell you his involvement in this particular matter?
A: No, sir.
At this point, defense counsel objected to the prosecutor’s eliciting testimony from the officer that emphasized the defendant had exercised his right to silence. The trial court overruled the objection.
The Louisiana Supreme Court found the defendant’s argument without merit and affirmed the defendant’s conviction and sentence. In so doing, the court noted that defense counsel, in his opening statement, raised the issue of the State’s failure to investigate the case. Since the defense *1246 broached the subject of a lack of investigation, the court found that the State was permitted to attempt to refute this assertion. The court explained:
Defense counsel was clearly making reference to the state’s failure to investigate, in order to boost his client’s position in the eyes of the jury by inferring that he was unjustly, or mistakenly, charged with forgery.
In this case since defense counsel suggested to the jury that the state had failed to investigate the matter, and implied that, had it been investigated properly, the forgery charges would not have been brought against the defendant, the state was allowed to respond by asking the defendant and the investigating officers whether or not they tried to determine the defendant’s involvement by questioning him at the time of his arrest. The defendant may not tell the jury that the state’s case is the result of improper investigation without allowing the state to try to show the jury that the investigation was indeed thorough, or at least sufficiently thorough as to include inquiries of the defendant in order to get leads which might verify, or dispute, defendant’s noninvolvement.
State v. Bell, 446 So.2d at 1194.
| ⅞| Likewise, in the instant case, defense counsel in his opening statement raised the issue of a deficient investigation. At trial, the State sought to refute this assertion by eliciting testimony from Detective Beavers which indicated he attempted to take a statement from defendant. Since the defense asserted the investigation was not thorough in its opening statement, the State was thereafter permitted to respond to show the jury that the investigation was thorough. Accordingly, we find that the trial court did not abuse its discretion in denying defendant’s request for a mistrial on this ground.

State’s Failure to Give Defense Counsel Exculpatory Information

Defendant next argues that the trial court erred in denying his motion for a mistrial based upon the State’s failure to divulge to the defense the deal it had reached with witness Kirk McKenzie to obtain his testimony at trial. Defendant claims that in response to his pre-trial request for exculpatory material, the State informed the defense of its deal with McKenzie but failed to disclose his arrest for the introduction of contraband into jail and the subsequent dismissal of the charge.
Prior to trial, in his motion for bill of particulars, discovery, and inspection, defendant requested that the State reveal any “deals” made with anyone, regardless of their status in this matter.[13] On November 9, 2010, the State responded, filing a notice of agreement with State’s witness, in which it revealed that it had entered into an agreement with Kirk McKenzie. The State revealed that McKenzie agreed to plead guilty to felon in possession of a firearm and possession of cocaine in 24th Judicial District Court case number 09-6500, and to felon in possession of a firearm, possession of marijuana with the intent to distribute, and aggravated flight from an officer in 24th Judicial District Court case number 10-1723. As part of the li>j>deal with this witness, the State agreed not to file a multiple offender bill of information against McKenzie in return for his agreement that he would “cooperate with the investigation and prosecution” of this case and would “testify truthfully in any proceeding in which he is called to the witness stand.”
*1247 At trial, during cross-examination, McKenzie admitted that he had been charged with introduction of contraband into a penal institution, in violation of LSA-R.S. 14:402.[14] He agreed that the arrest occurred when he was leaving from pleading guilty with his deal with the State. He further testified that the charge had been dismissed, as well as a similar charge against his girlfriend. He acknowledged that the deal with the State did not include the dismissal of the contraband charge because he had not been arrested for that offense at the time.
The State also introduced the testimony of Assistant District Attorney Shannon Swaim, who had been assigned McKenzie’s charge of attempted introduction of contraband. She testified that she was unaware McKenzie would be a witness in this case and that she dismissed the charge because it would not be worth the resources to prosecute him on the charge, which carries a maximum penalty of five years, when he was already serving ten years on an unrelated conviction.
While Ms. Swaim was on the stand, defense counsel requested review of her case file. After reviewing the file, defense counsel moved for a mistrial on the basis that the State failed to turn over the police incident report in connection with McKenzie’s charge of attempted introduction of contraband. In addition, defense noted a one page report prepared by Deputy Miles, which it had not been able to obtain, but had been contained in the district attorney’s file. Defense counsel | Margued this was a Giglio violation, warranting a mistrial. The trial court denied the request for a mistrial.
In Brady v. Maryland, 873 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that “the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment.” This rule was expanded to include evidence which impeaches the testimony of a witness, where the reliability or credibility of the witness may be determinative of guilt or innocence. Giglio v. United States, 405 U.S. 150, 153-55, 92 S.Ct. 763, 765-66, 31 L.Ed.2d 104 (1972).
Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A “reasonable probability” is a probability sufficient to undermine confidence in the outcome. United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). In determining whether the State’s failure to disclose evidence to the defense denied defendant a fair trial, the omission must be evaluated in the context of the entire record and, if there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. However, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt. United States v. Agurs, 427 U.S. 97, 112-13, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342 (1976). Thus, the question is not whether defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995).
*1248 | ¡,/The Louisiana Supreme Court has recognized three elements of a Brady claim: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued. State v. Garrick, 03-0137 (La.4/14/04), 870 So.2d 990, 993.
In the present case, defendant failed to proffer the documents. Therefore, we are unable determine whether the reports are favorable to defendant as either exculpatory or impeaching evidence. Moreover, it appears that defense counsel was aware of this report. During the bench conference on the motion for mistrial, defense counsel admitted that he was able to obtain a portion of the police report through his own investigation. Finally, we note that defendant failed to show at trial or on appeal how he was prejudiced by the withheld report. Rather, defendant offers only generic, non-specific assertions.
Based on the foregoing, we find that defendant has not shown a Brady/Giglio violation. Moreover, considering that the defense was aware of McKenzie’s deal and that the dismissal of the charge occurred after his deal was struck, there is no reasonable probability that, had the reports been disclosed to the defense earlier, the result of the proceeding would have been different. Accordingly, we find that the trial court did not abuse its discretion in denying defendant’s motion for mistrial on this ground.

Emotional Displays in Courtroom

On appeal, defendant also argues that the trial court should have granted a mistrial based on emotional displays by the State’s victim assistance coordinator, the victim’s father, and several members of the National Guard during the playing of the 911 tape. Defendant also claims that ribbons worn by the victim’s family contributed to a prejudicial display of emotion.
|j>BPuring a pre-trial bench conference, the defense objected to the wearing of ribbons by some people in the audience. The trial court found:
I’m going to find that the ribbons, as I see them, are unobtrusive. They’ve not identified the victim, that I can see. They do not identify anything. There is — 1-2-3-4-5-6-7-8-9-10-11-12-13-14-15-16-17-18 — eighteen people in the audience, and according to you-all, there are two people with ribbons, and I’m not going to have them remove those ribbons. I don’t find it prejudicial to your client.
On the second day of trial during a bench conference, the trial judge informed the State and defense of the following:
[W]hen the 911 tape was being played, the [victim assistance coordinator] was visibly distressed, crying and hugging— I don’t want to use the word “carrying on” — but hugging and visibly emotional during the playing of the 911 tape. I brought it to both sides’ attention for the mere purpose of putting an end to it. I don’t believe the jury saw it. I don’t believe that anyone in the jury was focused on that. They were more focused on what was occurring in the courtroom.
The defense then noted that:
[A]lso during the playing of the 911 tape, the child’s father became emotional; left with several — along with several members, uniformed members, they were in National Guard or some type of military uniform, they left all emotional. Not disruptive. I don’t mean to create some of this interpretation on the record, but obviously emotional, obviously during an emotional time. And I think the jury and everyone in court did notice *1249 that. Given those two things that did transpire, we would move for a mistrial.
The trial court thereafter denied defendant’s request for a mistrial. LSA-C.Cr.P. art. 775 provides that “[u]pon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771.” It has been consistently held that when the conduct does not fall within the mandatory mistrial provisions of LSA-C.Cr.P. art. 770, the judge has the sound discretion to determine whether the activity or comment so prejudiced the defendant that he could not receive a fair trial. State v. Talbot, 408 So.2d 861, 866 (La.1980).
| ^Courts have traditionally upheld denials of motions for mistrial based on emotional outbursts when a defendant fails to show their influence upon the jury prejudiced his right to a fair trial. State v. Clark, 02-1463 (La.6/27/03), 851 So.2d 1055, 1079 n. 25, cert denied, 540 U.S. 1190, 124 S.Ct. 1433, 158 L.Ed.2d 98 (2004). In State v. Wessinger, 98-1234 (La.5/28/99), 736 So.2d 162, 183, cert denied, 528 U.S. 1050, 120 S.Ct. 589, 145 L.Ed.2d 489 (1999), during the penalty phase of trial, the murder victim’s mother burst into tears when the victim’s sweater was introduced into evidence and the victim’s father shouted an expletive during the playing of the 911 tape. The defendant moved for a mistrial, which was denied. On appeal, the Louisiana Supreme Court affirmed that denial, finding:
We cannot say that the trial judge abused his vast discretion in denying the mistrial at issue in this assignment of error. Defendant does not demonstrate, and we cannot ascertain from the record, how these outbursts could have prejudiced him to such a degree that a mistrial was warranted. Again, we must credit the jurors with the good sense and fair-mindedness to see these outbursts for what they were, the natural and irrelevant expression of human emotion, and not let the outbursts influence their decision on defendant’s penalty.
In State v. Domangue, 350 So.2d 599 (La.1977), the Louisiana Supreme Court deemed a mistrial unnecessary when a rape victim’s spouse began crying during closing arguments. Likewise, in State v. Hopkins, 626 So.2d 820 (La.App. 2 Cir.1993), the appellate court found that a mistrial was not warranted when the victim’s family cried during closing arguments and the trial court later charged the jury not to be influenced by sympathy, passions, prejudice, or public opinion.
Similarly, in the instant case, we find that the display of ribbons and tears is the “natural and irrelevant expression of human emotion” to be expected in a case involving the death of a child. In addition, the record indicates that the ribbons, due to their few number, were inconspicuous and that the jury did not take notice of the emotional displays. As noted by the trial court, “I don’t believe the jury saw|27it. I don’t believe that anyone in the jury was focused on that. They were more focused on what was occurring in the courtroom.” Furthermore, the trial court instructed the jury that they were not to be influenced by sympathy, passion, prejudice, or public opinion.
Defendant does not demonstrate, nor does the record indicate, how these displays of emotion could have prejudiced him to such a degree that a mistrial was warranted. Accordingly, we find that the trial court did not abuse its discretion in denying defendant’s request for a mistrial on this ground.

*1250
Prosecutor’s Reference to Other Crimes Evidence

Lastly, defendant claims that a mistrial should have been granted when, during the prosecutor’s closing argument, the prosecutor listed defendant’s prior drug convictions as proof that defendant could not legally possess a firearm. Defendant contends that the prosecutor’s argument was designed to show his bad character.
LSA-C.Cr.P. art. 770(2) provides that a mistrial shall be granted, upon motion of the defendant, when a remark or comment is made within the hearing of the jury by the judge, district attorney, or a court official during trial or in argument and that remark refers to another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible.
In the instant case, defendant was also charged with possession of a firearm by a convicted felon, in violation of LSA-R.S. 14:95.1. In order to convict a defendant of illegal possession of a firearm by a convicted felon, the State must prove beyond a reasonable doubt that the defendant had (1) possession of a firearm; (2) a prior conviction for an enumerated felony; (3) an absence of the ten-year statutory period of limitation; and (4) the general intent to commit the offense. State v. Jones, 09-688 (La.App. 5 Cir. 2/9/10), 38 So.3d 306, 314. Thus, in a prosecution for possession of a firearm by a convicted felon, the State must prove that the defendant is indeed a convicted felon. Additionally, the Louisiana Supreme Court has held that the use of more than one prior conviction is permissible as proof of an “essential element” of LSA-R.S. 14:95.1, as follows:
Evidence of both of defendant’s previous felony convictions was admissible at trial as proof of an element of the crime charged and the manner in which the present offense was committed, proof of either prior conviction being sufficient to support defendant’s conviction for [violating LSA-R.S. 14:95.1]. Hence, the trial judge properly permitted introduction in evidence of both of defendant’s previous felony convictions.
State v. Sanders, 357 So.2d 492, 494 (La.1978).
During the presentation of its case, the State presented the testimony of Aischa Prudhomme, a latent print analyst with the Jefferson Parish Sheriffs Office Crime Lab and an expert in the field of fingerprint and latent print identification and comparison. Ms. Prudhomme testified that the fingerprints taken from defendant in court on September 20, 2011, matched the fingerprints taken in connection with prior arrests and convictions for distribution of cocaine within one thousand feet of a church, in violation of LSA-R.S. 40:981.3, possession of cocaine between twenty-eight and one hundred ninety-nine grams, in violation of LSA-R.S. 40:967(F), and distribution of cocaine, in violation of LSA-R.S. 40:967(A). Defendant did not object to this testimony or to the admission of his certified prior convictions.
Thereafter, in closing arguments, the prosecutor referenced these prior convictions. Defendant now complains that the trial court should have granted his motion for mistrial based on the State’s reference to these other crimes.
In the instant case, the State was required to prove defendant’s prior convictions in order to meet the elements of LSA-R.S. 14:95.1. In closing 1 ^argument, the State was merely referring to evidence that had been introduced at trial. Accordingly, we find that the prosecutor was permitted to refer to that evidence in his closing argument to argue to the jury that *1251 the State upheld its burden of proving all the elements of LSA-R.S. 14:95.1. Accordingly, these remarks did not unfairly prejudice defendant, and the trial court did not abuse its discretion in denying defendant’s motion for mistrial on this ground.
Based on the foregoing, we find no merit to the arguments raised by defendant in this assigned error and conclude that the trial court did not abuse its discretion in denying defendant’s motions for mistrial.

ERROR PATENT REVIEW

The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 387 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). Our review reveals that defendant’s sentence on his felon in possession of a firearm conviction is illegally excessive. At the time of the offense,[15] LSA-R.S. 14:95.1 carried a penalty of imprisonment at hard labor “for not less than ten nor more than fifteen years without the benefit or parole, probation, or suspension of sentence” and a fine of “not less than one thousand dollars nor more than five thousand dollars.”[16] Defendant was sentenced to twenty years at hard labor without benefit of parole, probation, or suspension of sentence and was fined one thousand dollars. Thus, defendant was sentenced to five years more than the term allowed by law. Accordingly, we vacate this illegal sentence and remand the matter to the trial court with instructions to resentence defendant in accordance with the applicable version of LSA-R.S. 14:95.1. State v. Mason, (La.App. 5 Cir. 1/11/11), 59 So.3d 419, 430, writ denied, 11-0306 (La.6/24/11), 64 So.3d 216.
We also note that while the trial judge ruled on defendant’s oral motion to reconsider sentence, the record does not indicate that she ruled on the written motion that defendant subsequently filed. Accordingly, we remand the matter with instructions to the trial court to rule on the written motion to reconsider and to supplement the record with the results. State v. Cummings, 07-686 (La.App. 5 Cir. 1/22/08), 977 So.2d 135, 142, writ denied, 08-0471 (La.9/26/08), 992 So.2d 984.
Accordingly, for the reasons set forth herein, we affirm defendant’s convictions for second degree murder, possession of a firearm by a convicted felon, and obstruction of justice. We vacate the twenty-year sentence that was imposed for defendant’s conviction of possession of a firearm by a convicted felon and remand the matter for resentencing, in accordance with the applicable version of LSA-R.S. 14:95.1, and for a ruling on defendant’s motion to reconsider sentence.

CONVICTIONS AFFIRMED; SENTENCE VACATED IN PART; MATTER REMANDED

WICKER, J., concurs with reasons.

. Also charged in this indictment were co-defendants Andre Preston, Samuel Baker, and Joshua Moss. Andre Preston was charged with attempted second degree murder, second degree murder, possession of cocaine with intent to distribute, and possession of a firearm while in possession of marijuana. Samuel Baker and Joshua Moss were charged with obstruction of justice.

. At trial, Cary Smoot testified that he was aware of an ongoing territorial dispute between his cousin Louis Smoot and defendant and Andre Preston, regarding an area in Ken-ner known as "The Dump,” a place where people regularly congregate to buy and sell narcotics.

. At the time of McKenzie’s testimony, he was incarcerated on various charges.

. At the time of their testimony, Pollard and Bardell were incarcerated on various charges.

. It is noted that Pollard testified that he spoke with "Joey.” Samuel Baker’s nickname is "Joey.”

. On cross-examination, Bardell acknowledged that in his statement to the police on November 12, 2009, he did not say that he saw defendant in the back of the vehicle with Andre Preston on November 8, 2009. Nevertheless, during both direct and redirect examination, Bardell stated that he saw defendant in the back of the vehicle with Andre Preston on November 8, 2009.

. In his statements, Smoot described the events as he did at trial with one exception: in his initial statement to police, Smoot stated that he telephoned his cousin "Brandon,” not "Louis," when he heard the gunshots on November 8, 2009. However, Detective Brett Beavers, the officer who obtained the statements, testified that Smoot cleared up the confusion regarding "Brandon” and "Louis” in his fourth statement. Detective Beavers concluded that Caiy Smoot spoke with his cousin Louis Smoot on the phone in the early morning of November 8, 2009, a conversation the detective corroborated with records from T-Mobile and Sprint.

. The Mark Twain apartment complex is located at the intersection of South Upland Avenue and Jefferson Highway in River Ridge.

. The short form for second degree murder is provided in LSA-C.Cr.P. art. 465(A)(32), which provides: "A.B. committed second degree murder of C.D.”

. An appellate court is allowed to reverse a trial court judgment on a motion to quash only if that finding represents an abuse of the trial court's discretion. State v. Love, 00-3347 (La.5/23/03), 847 So.2d 1198, 1206.

. As part of his argument on appeal, defendant asserts that Moss's silence in response to the question if he was with defendant on the night of the offense constituted an inadmissible non-verbal hearsay assertion. We find this argument to be misplaced because this non-verbal communication was made by the declarant while testifying at trial, and thus, was not an out-of-court statement as contemplated by the definition of hearsay. LSA-C.E. art. 801(C).

. In Doyle, the United States Supreme Court held that reference to a defendant's silence at the time of his arrest and after he received Miranda warnings for impeachment purposes violated his due process rights. The Supreme Court explained, “every post-arrest silence is *1245 insolubly ambiguous because of what the State is required to advise the person arrested.... it would be fundamentally unfair and a deprivation of due process to allow the arrested person’s silence to be used to impeach an explanation subsequently offered at trial.” Doyle v. Ohio, 426 U.S. at 617-18, 96 S.Ct. at 2244-45.

. The defense also included a request for exculpatory material.

. It is noted that McKenzie was actually charged with attempted introduction of contraband into a penal institution in violation of LSA-R.S. 14:27:402.

. It is well settled that the law in effect at the time of the commission of the offense is determinative of the penalty which the convicted accused must suffer. State v. Sugasti, 01-3407 (La.6/21/02), 820 So.2d 518, 520.

. It is noted that Acts 2010, No. 815, § 1 amended the statute to provide for a maximum sentence of 20 years. That amendment took effect on August 15, 2010.