WALTER J. ROTHSCHILD, Judge.
|20n February 28, 2008, defendant Rajel Johnson was indicted with second degree murder, in violation of LSA-R.S. 14:30.1, and armed robbery, in violation of LSA-R.S. 14:64.[1] Defendant was subsequently arraigned and pled not guilty.
Defendant filed a “Motion for Hearing to Determine the Admissibility of Detective Jason Barrette’s Arrest at the Trial.” The State then filed a “Motion in Limine in Support of Limiting the Details Underlying the Arrest of Jason Barrette,” which was granted by the trial court.
After a two-day trial commencing on October 27, 2010, a twelve-person jury found defendant guilty of the responsive verdict of manslaughter. Thereafter, defendant filed a Motion for Post-Verdict Judgment of Acquittal and a Motion for New Trial, which the trial court denied on November 3, 2010. On the same day, the trial judge sentenced defendant to 37 years imprisonment at hard labor.
Also, on November 3, 2010, the State filed a multiple offender bill of information against defendant. On January 12, 2011, defendant pled guilty as a | .¡multiple offender, and the trial judge vacated defendant’s original sentence and re-sentenced him to 39 years imprisonment at hard labor.[2] Defendant now appeals based on two assignments of error.

FACTS

Captain Dennis Thorton, Commander of the Homicide Section of the Jefferson Parish Sheriffs Office, investigated a homicide that occurred in the 300 block of Federal Drive in Avondale on October 28, 2007. When he arrived at the scene, he observed the deceased male, Charles Russell, in the passenger seat of a 2007 Pontiac G6 sedan. He testified that the deceased had been shot in the head. He further stated that the Pontiac G6, with a Georgia license plate, had been struck by gunfire and the rear back glass and the rear driver’s door glass had been “shot out” by projectile fire. He collected evidence, which included twelve .40 caliber shell casings, a spent copper projectile, a pair of sandal slippers, a Bic lighter, a pair of dice, a car key on' a key chain, a cell phone, a cigarette butt from the deceased’s mouth and a cigarette pack. He also photographed several different impressions of tire marks and shoe prints. Captain Thorton stated that it appeared that Charles Russell died in the *368 front seat of the vehicle with the projectile striking the rear of his head.
Dr. Karen Ross, a forensic pathologist with the Jefferson Parish Coroner’s Office, performed the autopsy on the body of Charles Russell. She testified that he had a gunshot wound on the back of his head, which caused his death. She stated that the entrance was on the back of the head and the bullet was recovered from the right side of his tongue. She testified that the wound was consistent with a bullet that had travelled through an - interposed target, which could have been windshield glass. She stated that the manner of death was homicide.
|4Louise Walzer, a former senior firearms examiner at the Jefferson Parish Sheriffs Office Crime Laboratory, testified that all the fired cartridge cases possessed characteristics consistent with a Glock weapon. However, her analysis of the fired cartridge casings revealed that two different Glock weapons were involved in the case. She also examined two .40 caliber class projectiles, but she could not conclude they came from the same weapon. At a later date, she received a .40 caliber semi-automatic Glock for examination.[3] After testing, she determined that this particular gun was used to fire four of the fired cartridge casings and was one of the two weapons involved in the shooting. However, with regard to the projectiles, she was unable to identify those bullets as being fired from a particular weapon. The State offered the .40 caliber semiautomatic Glock into evidence.
The State then called Adam Burke. He testified that the semiautomatic Glock was his handgun, which he had purchased in 2005. He stated that the gun was stolen from his car in October 2007.
Joseph Tate testified that he currently resides in Hancock State Prison, in Starter, Georgia, and is serving two years imprisonment for aggravated assault on a police officer, possession of crack cocaine and possession of marijuana. Mr. Tate stated that in October 2007, he drove from Georgia to New Orleans, in his Pontiac rental car, to see a friend. When he arrived in New Orleans, he wanted to purchase some marijuana. He stopped at a couple of gas stations and asked people “that looked like they had a street element to them” where he could buy some marijuana. He met the decedent, Charles Russell, who went by the name “Pookey of the neighborhood,” near a Travel Lodge off of the Manhattan exit. Russell got |smto the front passenger seat of Tate’s vehicle, began making some phone calls and eventually contacted defendant, also referred to as “Robo.”[4]
Tate followed defendant’s directions to a subdivision on Federal Drive. When Tate and Russell arrived, defendant informed Tate that he could obtain the marijuana and to “hang around for a little while.” After they were there for almost two hours, Tate began to grow impatient and Tate and Russell decided to leave and look elsewhere for the marijuana. A little later, Tate received a phone call from defendant, informing him that he had acquired the marijuana.
Tate returned to the house where he had originally been, saw defendant in the street, and defendant signaled for him to drive a little farther down the street to a darker area. Defendant then approached the vehicle and told Tate to give him the *369 cash, and he would get the marijuana. Tate stated that he felt uncomfortable with that plan, and he wanted to see what he was going to purchase in a little more light. Tate exited the vehicle, and he and defendant began walking towards a house. Tate testified that they walked together to the driveway. Defendant then “fell back a few feet, pulled out a weapon” and told him to lie down on the grass. Tate tried to get around a vehicle parked in the driveway, but two other men approached him, both with weapons drawn. At that point, Tate got down on the grass. The three men demanded Tate give them the cash from his pocket, and he complied. Defendant then instructed the two men to see if there was anything else in Tate’s pocket. Tate testified that after they took everything from his pockets, they debated whether or not to shoot him, and then they took off running. When he looked up, he saw defendant and the two other men running in the direction of his vehicle. He testified that they were “shooting up the car while they were running.” Tate then got up and ran to his vehicle. When he saw that Russell had been shot in Rthe back of the head, he ran in the opposite direction to a truck stop, about two miles away, and called the police.
At the police station, Tate gave a statement and signed a Rights of Arrestee form. He testified that that he did not initially tell the police about his attempt to purchase marijuana because he did not want to get into trouble. However, he eventually told them everything. Tate testified that he informed the police about defendant, and he gave the police his cell phone with the contact number. The police showed Tate a photographic line-up. Tate testified that he immediately recognized number two as defendant. He stated he was one hundred percent certain that number two, defendant, was the same individual that he had seen earlier that evening.
Tate testified that he was armed that day for protection with a 9 mm Hi-Point, which he legally owned. He testified that he did not fire a gun that evening, and he denied shooting Charles Russell. At trial, he identified defendant as the individual he knew as “Robo”.
The State then called former detective Jason Barrette. In October 2007, Barrette was employed as a detective with the homicide division of the Jefferson Parish Sheriffs Office. Barrette testified that on the evening of October 27, 2007, he was notified of a homicide in the three hundred block of Federal Drive, and was assigned as lead detective. When he arrived on the scene, he saw a vehicle with numerous bullet holes with a deceased individual inside. He also saw Tate in the back of another detective’s car. He remained on the scene for over an hour and then relocated to the Detective’s Bureau to interview Tate.
17At the Detective’s Bureau, he advised Tate of his Miranda[5] rights, and Tate willingly signed the Waiver of Rights form. Tate informed Barrette about defendant. Thereafter, Barrette compiled a six-picture photographic line-up, which included defendant and five other black males with similar characteristics, and Tate identified number two as defendant. Barrette then obtained an arrest warrant for defendant and a search warrant for defendant’s residence, located at 337 Dome Street.
On October 28, 2007, Barrette conducted a search of defendant’s residence, and defendant subsequently turned himself over to the police. Upon arrival at the Detective’s Bureau, defendant was placed in an *370 interview room and advised of his rights. He signed a Rights of Arrestee form, waived his rights and gave two taped statements. Barrette testified that he did not threaten, coerce or promise defendant anything in exchange for his statement. The State played both of defendant’s taped statements for the jury.
In defendant’s first statement, he recalled shooting dice on the three hundred block of Federal Drive on October 27, 2007. Thereafter, the driver of a silver vehicle asked defendant where he could buy two pounds of marijuana, and indicated that he was willing to pay $100. When Detective Barrette asked defendant who was in the vehicle, he stated, “[the driver], the victim and ... somebody else in the back seat.” Defendant stated that the victim was sitting in the front passenger’s side seat. Later that day, defendant informed an individual named Ernest Pierce of the driver’s interest in purchasing some marijuana. Defendant stated that Pierce indicated that he wanted to rob the driver.
|RLater that evening, defendant was with Pierce and two other individuals, Rashad and Ross,[7] when the driver of the silver vehicle arrived and exited the vehicle. He stated that Pierce had a .40 caliber Glock, and Ross and Rashad also both had guns. Defendant stated that Pierce pulled out his gun and the driver attempted to run, but he fell down. Defendant then ran over and grabbed the money. Defendant stated that Pierce “started shooting,” and they all “started running.”
In his second statement, defendant admitted to firing a gun at the vehicle. He stated that he picked up the money, began running, and when he was about 50 feet away from the car, he started shooting back at the vehicle with a .40 caliber Hi-Point. He stated he also saw Pierce shooting at the vehicle.
At trial, former Detective Barrette testified that he arrested Ernest Pierce, Ross Kelly and Rashad Robinson in connection with the case. He also stated that a DNA test was performed on slippers found at the scene that were a match for Ernest Pierce.[8]
Detective Jeffrey Rodriguez testified that in October 2007, he worked for the Homicide Section of the Jefferson Parish Sheriffs Office. On the evening of October 27, 2007, he was called to the three hundred block of Federal Drive in Avon-dale with former Detective Barrette to investigate a homicide. Detective Rodriguez further stated that he participated in the interview and subsequent taped statements of defendant on October 30, 2007. He testified that he did not threaten or promise defendant anything in exchange for his statement.

LAW AND DISCUSSION

|aBy his second assignment of error[9], defendant argues that the evidence was insufficient to support the charge of *371 second degree murder or the responsive verdict of manslaughter. Defendant contends that negligent homicide was the most appropriate verdict.
The State counters that it proved beyond a reasonable doubt that defendant was guilty of second degree murder. The State further contends that defendant is not entitled to relief since: (1) he did not object to the responsive verdict of manslaughter, and (2) the State met its burden with regard to the charged offense.
In reviewing the sufficiency of evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Neal, 00-0674, p. 9 (La.6/29/01), 796 So.2d 649, 657, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002); State v. Lawson, 08-123, p. 7 (La.App. 5 Cir. 11/12/08), 1 So.3d 516, 522.
In cases involving circumstantial evidence, the trial court must instruct the jury that, “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” LSA-R.S. 15:438. The reviewing court is not required to determine whether another possible hypothesis of innocence suggested by the defendant offers an exculpatory explanation of events. Rather, the reviewing court must determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could | innot have found proof of guilt beyond a reasonable doubt. State v. Mitchell, 99-3342, p. 7 (La.10/17/00), 772 So.2d 78, 83; State v. Washington, 03-1135, p. 4 (La.App. 5 Cir. 1/27/04), 866 So.2d 973, 977.
In the present case, defendant was charged with second degree murder but was convicted of the responsive verdict of manslaughter. When a defendant does not object to a legislatively responsive verdict, the defendant’s conviction will not be reversed, whether or not that verdict is supported by the evidence, as long as the evidence is sufficient to support the offense charged. State ex rel. Elaire v. Blackburn, 424 So.2d 246, 252 (La.1982), cert. denied, 461 U.S. 959, 103 S.Ct. 2432, 77 L.Ed.2d 1318 (1983); State v. Austin, 04-993, p. 13 (La.App. 5 Cir. 3/1/05), 900 So.2d 867, 878, writ denied, 05-0830 (La.11/28/05), 916 So.2d 143. The Blackburn court explained:
It would be unfair to permit the defendant to have the advantage of the possibility that a lesser “compromise” verdict will be returned (as opposed to being convicted of the offense charged) and then to raise the complaint for the first time on appeal, that the evidence did not support the responsive verdict to which he failed to object.
Blackburn, 424 So.2d at 251-52.
In the present case, defendant did not object to the responsive verdict of manslaughter prior to the jury rendering its verdict.[10] Therefore, we find that it is only necessary to consider if the evidence was sufficient to support the offense of second degree murder.
*372 Second degree murder is defined as the killing of a human being when the offender: (1) has specific intent to kill or to inflict great bodily harm; or (2) is engaged in the perpetration or attempted perpetration of one of several enumerated | ¶ í felonies, including armed robbery,[11] even though he has no intent to kill or to inflict great bodily harm.[12] LSA-R.S. 14:30.1(A). See also State v. Kirkland, 01-425, p. 6 (La.App. 5 Cir. 9/25/01), 798 So.2d 263, 268, writ denied, 01-2967 (La.10/14/02), 827 So.2d 415. One need not possess specific intent to kill or inflict great bodily harm to be a principal to a second degree felony murder. See State v. Hill, 98-1087, p. 9 (La.App. 5 Cir. 8/31/99), 742 So.2d 690, 696, writ denied, 99-2848 (La.3/24/00), 758 So.2d 147.
In the present case, the State presented evidence that decedent, Charles Russell, was killed while defendant was engaged in the perpetration of an armed robbery. At trial, Dr. Karen Ross, a forensic pathologist with the Jefferson Parish Coroner’s Office, testified that Charles Russell’s death was caused by a gunshot wound to the back of his head, and that the wound was consistent with a bullet that had trav-elled through an interposed target, such as windshield glass. She further stated that the manner of death was homicide.
Joseph Tate testified that defendant pulled out a weapon and told him to lie down on the grass. He stated that defendant and two other men demanded that he give them his money. Tate testified that after they robbed him, he looked up and saw them running and firing their weapons at his vehicle. When he saw that decedent had been shot in the head, he ran in the opposite direction and called the police. At the police station, he identified defendant in a photographic line-up as the same person who had robbed him that evening.
In defendant’s taped statements, he admitted that Tate was robbed at gunpoint and that he grabbed the money. He further stated that Ernest Pierce had a |12.40 caliber Glock, and that Pierce fired his weapon at the vehicle. Additionally, defendant admitted firing his weapon at the vehicle as he was fleeing the scene.
Regardless of whether defendant fired the fatal shots, we find the evidence was sufficient to prove defendant was at least a principal to second degree murder. Under LSA-R.S. 14:24, “[a]ll persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.” Only those persons who “knowingly participate in planning or execution of a crime” are principals to that crime. State v. Pierre, 93-893, p. 4 (La.2/3/94), 631 So.2d 427, 428; State v. King, 06-554, pp. 7-8 (La.App. 5 Cir. 1/16/07), 951 So.2d 384, 390, writ denied, 07-371 (La.5/4/07), 956 So.2d 600.
 Mere presence at the scene of a crime does not make one a principal to the crime. Id. However, “[i]t is sufficient encouragement that the accomplice is standing by at the scene of the crime *373 ready to give some aid if needed, although in such a case it is necessary that the principal actually be aware of the accomplice’s intention.” State v. Page, 08-531, p. 10 (La.App. 5 Cir. 11/10/09), 28 So.3d 442, 449, writ denied, 09-2684 (La.6/4/10), 38 So.3d 299 (citing, State v. Anderson, 97-1301, p. 3 (La.2/6/98), 707 So.2d 1223, 1225 (per curiam)).
In the present case, defendant admitted that he was at the murder scene with knowledge that Pierce planned to rob the victim.[13] However, defendant did nothing to prevent the crime. Rather, by his own admission, he grabbed Tate’s money and fled the scene, firing his gun towards the vehicle, where the deceased was a passenger, as he fled. Although it is not clear if defendant fired the fatal shots, we conclude that the State’s evidence showed that defendant was at least a 1^principal to the crime.
Finally, the credibility of a witness is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness, and credibility will not be reweighed on appeal. State v. Rowan, 97-21, p. 7 (La.App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056. After reviewing the record and viewing the evidence in the light most favorable to the prosecution, we find the evidence was sufficient to support defendant’s second degree murder conviction.
By his next assignment, defendant argues that the trial court erred in not allowing defense counsel to question former Detective Barrette regarding his dismissal from the police department and his reputation for truthfulness. The State contends that defendant’s argument has no merit, citing this Court’s decision in State v. Wiley, 10-811 (La.App. 5 Cir. 4/26/11), 68 So.3d 583.
In the present case, defendant filed a “Motion for Hearing to Determine the Admissibility of Detective Jason Barrette’s Arrest at the Trial,” arguing that testimony regarding Barrette’s arrest should be admissible at trial. In his memorandum, defendant stated that the facts surrounding Barrette’s arrest were not in dispute. He stated that Barrette gave a statement concerning allegations that he had engaged in “doctor shopping” in an attempt to obtain CDS prescriptions by fraud and/or deceit, that he admitted to filing two false police reports that his automobile was burglarized, and was offered an opportunity to enroll in a Diversion Program in lieu of being prosecuted. Defendant contended that in the two statements he gave to Barrette after his arrest, “he merely recited information ... that had previously been provided to him by Detective Barrette.” Therefore, defendant argued that Detective Barrette’s credibility was an issue, and the information surrounding his arrest bears on his credibility.
114The State then filed a “Motion in Li-mine in Support of Limiting the Details Underlying the Arrest of Jason Barrette.” The State argued that under LSA-C.E. Art. 609.1, the use of character evidence concerning a witness’ criminal activity and/or alleged criminal activity is narrowly restricted when attacking credibility. And, the admission of criminal activity is limited to convictions, and “neither an arrest nor any additional details of a convicted offense are admissible as a general rule,” citing LSA-C.E. Art. 609.1(B) and (C). The State argued that Barrette was not convicted of an offense, and questions regarding the details of Barrette’s arrest “would result in an inquest of his prescrip *374 tion drug problem rather than a trial based on the evidence presented against defendant.” The State further noted that the Office of the Jefferson Parish District Attorney and the Office of the Louisiana Attorney General had recused themselves from any charges arising from Barrette’s arrest. The trial court granted the State’s Motion in Limine, finding that evidence regarding Detective Barrette’s arrest was precluded.
At trial, defendant re-urged his motion, and the trial court re-affirmed its earlier ruling. The trial court stated that defense counsel was limited to asking Barrette whether he was still employed with the Sheriffs office.
The credibility of a witness may be attacked by any party, including the party calling him. LSA-C.E. art. 607(A). LSA-C.E. art. 609.1(B) provides that “[generally, only offenses for which the witness has been convicted are admissible upon the issue of his credibility, and no inquiry is permitted into matters for which there has only been an arrest, the issuance of an arrest warrant, an indictment, a prosecution, or an acquittal.” Despite the general rule, the possibility that the prosecution may have leverage over a witness due to that witness’s pending criminal charges is recognized as a valid area of cross-examination. State v. Rankin, 465 So.2d 679, 681 (La.1985); State v. Brady, 381 So.2d 819, 822 (La.1980).15 It is well-settled that a witness’s “hope or knowledge that he will receive leniency from the state is highly relevant to establish bias or interest.” State v. Bowie, 2000-3344 (La.4/3/02), 813 So.2d 377, cert. denied, 537 U.S. 951, 123 S.Ct. 416, 154 L.Ed.2d 297 (2002) (quoting State v. Vale, 95-1230, 95-0577 (La.1/26/96), 666 So.2d 1070). Moreover, a “witness’s bias or interest may arise from arrests or pending criminal charges, or the prospect of prosecution, even when he has made no agreements with the state regarding the conduct.” Vale, 95-1230, 95-0577, 666 So.2d at 1071.
The admissibility of evidence under LSA-C.E. art. 607(A) and LSA-C.E. art. 609.1(B) is subject to the balancing standard of LSA-C.E. art. 403, which states that “[although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.” A trial judge’s determination regarding the relevancy and admissibility of evidence will not be overturned on appeal absent a clear abuse of discretion. State v. Sandoval, 02-230 (La.App. 5 Cir. 2/25/03), 841 So.2d 977, 985, writ denied, 03-853 (La.10/3/03), 855 So.2d 308.
In Wiley, supra, this Court found that the trial court did not abuse its discretion in ruling that no mention of Barrette’s arrests could be presented at trial. Wiley, 10-811 at 16, 68 So.3d at 592. In Wiley, defendant argued that the trial court erred in refusing to allow him to question Barrette about his felony drug arrests and to present evidence that Barrette had filed false police reports. Id., 10-811 at 14, 68 So.3d at 591. This Court stated that, according to the record, Barrette had not been promised anything by the State in return for his testimony. Nor was there any evidence that Barrette acted inappropriately, and his own arrest was remote from the arrest of defendant. Therefore, this Court found that there was 11BIittIe probative evidentiary value to disclosing the nature of Barrette’s arrest. Id., 10-811 at 16, 68 So.3d at 592. Also see State v. Hollins, 97-627, p. 6 (La.App. 5 Cir. 11/25/97), 704 So.2d 307, 309, writ denied, 99-0507 (La.8/25/99), 747 So.2d 50 (finding that evidence of arresting officer’s suspension was inadmissible for impeachment *375 purposes because it did not involve a conviction).
Similar to Wiley, the record in the present case does not indicate that Barrette was promised anything by the State in return for his testimony. Furthermore, no evidence was presented that Barrette acted inappropriately, and his arrest was remote from the arrest of defendant. Therefore, we find that there was little probative evidentiary value to disclosing the nature of Barrette’s arrest, and we find that the trial court did not abuse its discretion. This assignment of error lacks merit.
Defendant also requests an error patent review which this court routinely performs pursuant to LSA-C.Cr.P. art. 920. Upon review, we have discovered no error which requires corrective action. Accordingly, the conviction and sentence of defendant Rajel Johnson are hereby affirmed.

AFFIRMED

. On October 27, 2010, the State dismissed the armed robbery charge against defendant.

. The record does not include the transcript of the multiple bill hearing. However, defendant’s multiple offender proceedings are not challenged herein and are therefore not before us in this appeal.

. The Jefferson Parish Sheriff's Office seized a .40 caliber Glock semi-automatic pistol in an unrelated case.

. In the transcript, defendant is also sometimes referred to as "Rebo.”

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. The record shows that these individuals were later identified as Rashad Robinson and Ross Kelly.

. The State and defense counsel stipulated that Sara Corgan, an expert in the field of forensic DNA analysis, tested the DNA extracted from the slippers recovered from the. scene against a sample from an individual named Ernest Pierce and concluded that they were a match.

. Defendant’s assignments of error are addressed out of order so the sufficiency of the evidence is addressed first in accordance with State v. Hearold, 603 So.2d 731, 734 (La.1992). In Hearold, the Louisiana Supreme Court stated that when the issues on appeal relate to both sufficiency of the evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence.

. In his Motion for Post-Judgment Verdict of Acquittal, defense counsel argued that no evidence was presented at trial that "this crime was committed in the heat of passion or as the result of some sort of provocation.” Therefore, he asked the court to render a verdict of not guilty or render the responsive verdict of negligent homicide. The trial court denied the motion.

. Armed robbery is the "taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.” LSA-R.S. 14:64.

. The record is unclear under which theory of second degree murder the State presented its case. Because the evidence is sufficient to convict defendant at least as a principal to second degree murder while involved in the commission of an armed robbery, we will not address the merits of the specific intent theory.

. Contrary to defendant’s statement, Tate testified that it was defendant who initially pulled out his weapon and told him to lie down on the grass.