SUSAN M. CHEHARDY, Chief Judge.
|2On appeal, defendant challenges his convictions and sentences for second degree murder and possession of a firearm by a convicted felon. For the following reasons, we affirm defendant’s convictions and sentences.

Procedural History

On September 15, 2011, a Jefferson Parish Grand Jury indicted defendant, Jamar-io R. Alexander, with second degree murder, in violation of La. R.S. 14:30.1, and possession of a firearm by a convicted felon, in violation of La. R.S. 14:95.1. Defendant was arraigned and pled not guilty. On May 8, 2012, trial commenced. After hearing three days of testimony and evidence, the twelve-person jury found defendant guilty as charged on both counts.
*1143 On May 17, 2012, the trial judge heard and denied defendant’s first motion for new trial. After the defendant waived the statutory sentencing delays, the trial judge sentenced defendant for his conviction of second degree murder to life imprisonment without benefit of parole, probation, or suspension of sentence and, for being a felon in possession of a firearm, to imprisonment in the Department of | .¡Corrections for 20 years without benefit of parole, probation, or suspension of sentence, to run consecutively.
On June 27, 2012, defendant filed a second motion for new trial based on the discovery of new and material evidence. On September 12, 2012, the trial judge heard and denied defendant’s second motion for new trial. On September 27, 2012, defendant filed a motion for appeal that was granted.

Facts

At 8:27 a.m. on May 27, 2011, a man calling himself “Carlos” called United Cab from 504-287-8932 to request that a taxicab be dispatched to 4121 d’Hemecourt in New Orleans. The same man called again at 8:46 a.m. that morning to again request a taxicab. According to records from United Cab, its driver, William Kerner, IV, was dispatched and picked up a fare at 4121 d’Hemecourt that morning.
At 9:14 a.m. that morning, Shawn Deg-gins, who was inside his home at 204 Adonis Way in Terrytown, called 911 to report that a cab driver had been shot and was lying in the street in front of 211 Adonis Way. Mr. Deggins reported that he had heard multiple gunshots, looked out of his window, and saw a man -with a gun in his right hand running away down Adonis Way. The man, who Mr. Deggins saw from “the back primarily,” was wearing a black t-shirt, dark pants, and a Hornets cap turned backwards. Mr. Deggins stated that the man jumped a fence at the back of an empty lot on Adonis Way.[1] Mr. Deggins reported that, when he Rlooked out of his other window, he saw the victim lying in the street in front of 211 Adonis Way.[2]
When Captain Dennis Thornton, the Commander of the Jefferson Parish Sheriff’s Office (“JPSO”) Homicide Division, arrived, he observed the victim lying face down with his United Cab identification badge next to him. He also observed a Dodge van painted with the logo of United Cab that had collided with a pickup truck on the servitude three houses down. After discovering the identification badge with the victim’s name, investigators contacted United Cab to ascertain information about the victim’s last fare. The United Cab representative gave investigators the telephone number that United Cab’s telephone system recorded for the victim’s last fare.
When investigators obtained the records for that telephone number, which was registered to Mary Alexander, they confirmed that two calls were made from that specific cellular phone to United Cab that morning. *1144 When Ms. Alexander was contacted, she stated that she had purchased that phone for her grandson, Jamario Alexander, to use.
The telephone records further showed that calls were made from that phone to Brittney Jones at 9:11 a.m. that day, which was minutes after the gunshots were reported. When officers later interviewed Ms. Jones, they learned that she was Jam-ario Alexander’s girlfriend. She stated that Jamario had called her early that morning for a ride from New Orleans to the West Bank, but she refused. Later that morning, Jamario called her and asked her to pick him up in Terrytown. When Ms. Jones picked him up, Jamario was wearing a black shirt and jeans and a Hornets cap.
|5When Ms. Jones took Jamario to her home in Algiers, he immediately discarded his t-shirt and hat in a trash bag in her kitchen. Ms. Jones also saw Jamario empty the clip of a gun and noticed that he only had a few bullets left. After Jamario left her house, he texted her from another person’s phone, “Dis[sic ] Mario my phone and tool[gun] behind da[sic ] sofa.” Shortly thereafter, defendant went back to her residence and retrieved his cell phone and gun.
Later that evening, Detective Travis Es-erman and Detective Matthew Vasquez of JPSO were informed by technicians with Sprint that the suspect’s cell phone was “pinging” on Carrollwood Village Drive in Gretna. Subsequently, deputies discovered Jamario Alexander in an apartment at 753 Carrollwood Village Drive, detained him, and transported him to the JPSO Detective Bureau. Subsequently, Sergeant Klein of the JPSO obtained a search warrant for that apartment and found a Smith and Wesson 9-mm handgun in the bedroom closet where Jamario Alexander had been hiding. Ballistics testing revealed that it was not used to fire the shots that killed the victim.
When Jamario Alexander arrived at the JPSO Detective Bureau, he emptied his pockets onto Detective Eserman’s desk and Detective Eserman observed receipts and other innocuous items. However, Detective Eserman realized later that investigators did not recover any cash from the victim or his cab, which is odd since cab drivers receive cash and need cash to make change. Detective Eserman also learned that the victim was known to carry about $2,000.00 in cash. When the detective obtained a search warrant, retrieved and viewed the receipts, he noticed that the receipts were time-stamped later in the day after the shooting. One receipt showed a purchase at Champs Sports for $376.55 at 8:39 p.m., and another receipt showed a purchase at McDonald’s for $14.57 at 9:02 p.m.
| ¿Thereafter, Detective Eserman advised Jamario Alexander of his constitutional[3] rights, which he waived to give his statements. In his first statement dated May 28, 2011, at 12:34 a.m., defendant explained that his mother dropped him off at his grandmother’s house on d’Hemecourt at approximately 7:15 a.m. on May 27, 2011. Jamario admitted that he called for a taxi from United Cab that morning. He gave the dispatcher a random name and a random address on d’Hemecourt since he was on foot from his grandmother’s house.
Jamario stated that the taxicab driver, who was a white man, took Jamario to the Joy Theater on Canal Street then Jamario paid the cab driver $25.00. Jamario stated that he forgot his helmet, gloves, and cell phone in the taxicab when he disembarked. *1145 From Canal Street, Jamario took the bus to General Degaulle then walked to Rally’s, called Darius Toliver, who sent Tyrone P. Lewis to pick Jamario up to run errands. Eventually, they went to a friend’s apartment.
After his first statement, Jamario Alexander remained in the interview room. However, the investigation pointed to Jam-ario as the shooter so Detective Vasquez entered the interview room and informed Jamario Alexander that he was being arrested for second degree murder.
After he was informed that he was being arrested, defendant gave a second statement, admitting that “something happened accidently[sic ].... I take full responsibility I’m sorry I plead guilty” to shooting the victim.
Defendant explained that, on May 27, 2011, his mother dropped him off at his grandmother’s house on d’Hemecourt, and he called a cab from there. When the cab driver picked him up, defendant told him he wanted to go to the West Bank, and he directed the cab driver to Adonis Way, even though he did not know 17anyone who lived on that street. Defendant claimed that he intended to exit the cab and “skip out” on the fare. Defendant said that, when the driver asked for the fare, defendant panicked and shot him. He admitted that he fired more than once.
After defendant shot the cab driver, the driver exited the vehicle through the driver’s side door. Defendant stated that he followed the driver out through the front driver’s door of the cab. Defendant then ran and jumped the fence behind the houses and walked toward Terrytown. Afterward, defendant called his girlfriend, Brittney Jones, who picked him up nearby and drove him to her house.
Defendant stated that, after leaving Ms. Jones’s house, he went to a barber shop on General Meyer to get a haircut then to a friend’s house in Terrytown, where he was ultimately arrested. Defendant claimed that he brought the gun that he used to shoot the cab driver to the apartment in Carrollwood Village and put it on a bed while he was taking a shower, but did not know what happened to it. He also said that when he got in the cab, he had his motorbike helmet and gloves with him, and that he left those in the cab.
At trial, Dr. Susan Garcia, who was accepted as an expert in the field of forensic pathology, testified that she performed the autopsy on the victim. She stated that the cause of the victim’s death was multiple gunshot wounds, and the manner of Mr. Kerner’s death was homicide. Dr. Garcia explained that the victim sustained 12 entrance wounds and 11 exit wounds,[4] and that two of the wounds were lethal.
Dr. Garcia stated that the victim sustained one intermediate range gunshot wound to the right side of his head and another intermediate range gunshot wound to his right upper back. Dr. Garcia thought the head wound was consistent with the victim turning his face to the right, as if looking over his right shoulder, then being |sfired upon from between one to three feet away. The victim then sustained the wound in his right upper back when he turned his body towards the left as he attempted to get away from the shooter and exit his van. She stated that the remaining ten wounds would be classified as fired from more than three feet away, which is consistent with a person attempting to flee from an individual who was shooting at him.
*1146 Adriana Perez, who was accepted as an expert in the field of DNA analysis, testified that the defendant’s DNA was present on the motorcycle helmet and the gloves found in the cab. Donna Quintanilla, who was accepted as an expert in the field of latent print examinations, testified that three prints that matched defendant’s fingerprints were recovered from the rear passenger side window of the victim’s cab. Joel O’Lear, who was accepted as an expert in the field of firearms and tool mark examination, testified that the casings found on the scene were either 38 class or 9 mm, were all fired from the same weapon, and were all consistent with the type of gun that defendant admitted to using during this crime.
At trial, defendant’s mother and grandmother testified that defendant was trying to get into college that day. Further, the defense elicited testimony at trial from Captain Thornton, Detective Eserman, and a representative from United Cab Company that the victim, William Kerner, was a “whistleblower” who was helping the New Orleans Mayor’s Office to investigate corruption in the New Orleans Taxicab Bureau. Both Captain Thornton and Detective Eserman testified that both the JPSO investigation and the New Orleans Inspector General’s investigation revealed “no connection” between the victim’s murder and his involvement in the taxicab bureau investigation.
Finally, the State and the defendant stipulated that defendant had two prior felony convictions in Orleans Parish: in 2005, defendant pled guilty to distribution |flof cocaine, and, in 2006, defendant pled guilty to possession of cocaine. After hearing the testimony and reviewing the evidence, the jury, voting eleven to one, found defendant guilty as charged on both counts. This appeal follows.

Law and Argument

On appeal, defendant raises two counseled and six pro se assignments of error. In his counseled assignments of error, defendant argues: first, the trial court erred in denying the motion for new trial because of newly discovered evidence and the evidence was insufficient to support the jury’s verdict; and second, the trial court erred in failing to grant a mistrial or even requesting a new panel of potential jurors when the jury panel heard Mr. Kerner’s daughter screaming at Jamario in the courtroom.
In his pro se assignments of error, defendant argues: first, “Insufficiency of Evidence;” second, “Right to Testify;” third, “Right to Present a Defense;” fourth, “whether due process of law was violated where defendant was subjected to an unreasonable arrest;” fifth, “whether the identification is constitutionally deficient under the totality of the circumstances to warrant a conviction;” and sixth, “whether defendant was denied a fair trial where two jurors openly express prejudice before trial.”
In his first counseled and first pro se assignments of error, defendant raises the sufficiency of the evidence presented against him. When the issues on appeal relate to both the sufficiency of evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence by considering the entirety of the evidence. State v. Hearold, 603 So.2d 731, 734 (La.1992). If the reviewing court determines that the evidence was insufficient, then the defendant is entitled to an acquittal, and no further inquiry as to trial errors is necessary. Id. Alternatively, when the entirety of the evidence, both admissible 1 mand inadmissible, is sufficient to support the conviction, the defendant is not entitled to an acquittal, and the reviewing court must consider the *1147 assignments of trial error to determine whether the accused is entitled to a new trial. Id. Therefore, we will address the sufficiency of the evidence at the outset.
In reviewing the sufficiency of evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Neal, 00-0674 (La.6/29/01), 796 So.2d 649, 657, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002).
In cases involving circumstantial evidence, the trial court must instruct the jury that, “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” La. R.S. 15:438. The reviewing court is not required to determine whether another possible hypothesis of innocence suggested by the defendant offers an exculpatory explanation of events. Rather, the reviewing court must determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. State v.. Mitchell, 99-3342 (La.10/17/00), 772 So.2d 78, 83; State v. Washington, 03-1135 (La.App. 5 Cir. 1/27/04), 866 So.2d 973, 977.
Initially, defendant’s appellate counsel argues that the trial judge erred by denying his motion for new trial because the evidence was insufficient to support his conviction of possession of a firearm by a convicted felon. Defendant contends that the State failed to prove beyond a reasonable doubt that he possessed or constructively possessed the gun found in the closet of the apartment where he was 1n arrested. The State responds that this issue is waived because this ground was not argued in the trial court in either of defendant’s motions for new trial. The State further responds that, even if this Court were to reach the merits, the evidence presented at trial was sufficient to show that defendant possessed a gun.
Although the State is correct that defendant did not raise this ground as the basis for either the first or second motion for new trial he filed, we note that the proper procedural vehicle for raising the issue of the sufficiency of the evidence is a motion for post-verdict judgment of acquittal. La.C.Cr.P. art. 821; State v. Lande, 06-24 (La.App. 5 Cir. 6/28/06), 934 So.2d 280, 289 n. , 18, writ denied, 06-1894 (La.4/20/07), 954 So.2d 154 (citing State v. Allen, 440 So.2d 1330, 1331 (La.1983)). Further, while defendant did not file a post-verdict judgment of acquittal, we again note that the failure to file said motion does not preclude appellate review of the sufficiency of the evidence. State v. Washington, 421 So.2d 887, 889 (La.1982); State v. Carey, 04-1073 (La.App. 5 Cir. 3/29/05), 901 So.2d 509, 512 n. 4. As such, we will address the merit of defendant’s claims.
With respect to the sufficiency of the evidence presented to support his conviction for possession of a firearm by a convicted felon, defendant argues that the State failed to prove that he possessed or constructively possessed a gun found in the closet of a random bedroom. Defendant correctly points out that he was not the registered owner of the gun, did not live in the apartment where the gun was found, and that the gun was not the murder weapon. Defendant also states that his friends recanted their statements that (1) they saw defendant with a gun that night and (2) they saw defendant hide in the closet where the gun was later found.
*1148 Here, defendant was convicted of possession of a firearm by a convicted felon, in violation of La. R.S. 14:95.1. In order to convict a person of being a felon in possession of a firearm, the State must prove: 1) the defendant possessed the |12firearm; 2) the defendant had a prior conviction for an enumerated felony; 3) the defendant possessed the firearm within ten years of the prior conviction; and 4) the defendant had the general intent to commit the offense. State v. Watson, 08-214 (La.App. 5 Cir. 8/19/08), 993 So.2d 779, 784.
Actual possession of a firearm is not necessary to prove the possession element of La. R.S. 14:95.1. Constructive possession is sufficient to satisfy the element of possession. State v. Day, 410 So.2d 741, 743 (La.1982). A person is in constructive possession of a firearm if the firearm is subject to his dominion and control. State v. Johnson, 03-1228 (La.4/14/04), 870 So.2d 995, 998. A person’s dominion over a weapon constitutes constructive possession, even if it is only temporary in nature and even if control is shared. Id. at 999.
A defendant’s mere presence in an area where a firearm was found does not necessarily establish possession. Id. The State must prove that the offender was aware that a firearm was in his presence and that the offender had the general intent to possess the weapon. Guilty knowledge may be inferred from the circumstances and proved by direct or circumstantial evidence. Id. at 998.
On appeal, defendant does not challenge the evidence as to his prior convictions or the cleansing period but rather the evidence that he actually or constructively possessed the gun found in the closet.
The record in this case reflects that Jarrett Conner, Darius Toliver, and Eric McMillan testified at trial that they were in the apartment with defendant when the police came to the door. Mr. Conner testified at trial that he did not see defendant with a gun that day and could not remember whether he saw defendant go into a closet. However, on cross examination, Mr. Conner admitted that he gave a prior statement to the police saying that defendant had a gun that day and that he went into the closet after the police knocked on the door.
1 ^Likewise, Mr. Toliver testified at trial that he did not see defendant with a weapon that day, and that he did not pay attention to what defendant did once they found out the police were at the door. However, like Mr. Conner, on cross examination, Mr. Toliver admitted that he gave a prior statement to the police saying that defendant had a gun that day and that he went into the closet after the police knocked on the door.
Finally, Mr. McMillan testified that he never saw defendant with a weapon and did not remember defendant going into the closet after the police knocked on the door. However, like Mr. Conner and Mr. Toliver, Mr. McMillan admitted, upon cross examination, that he gave a statement to the police that, once the officers knocked on the door, defendant went into the closet.
After considering the testimony of the witnesses, the jury could have reasonably found that the State presented sufficient evidence, especially in the witnesses’ prior statements, that defendant had constructive possession of the weapon found in the apartment where defendant was discovered. The credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; the credibility of the witnesses will not be reweighed on appeal. State v. Rowan, 97-21 (La.App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056.
*1149 In light of the foregoing, we find that a rational trier of fact could have found that the evidence was sufficient under the Jackson standard to support defendant’s conviction for possession of a firearm by a convicted felon.
Next, defendant argues, in his first pro se assignment of error, that the evidence was insufficient to support his second degree murder conviction because (1) the State failed to prove he committed an armed robbery or attempted armed robbery of the victim and (2) the State failed to establish that he was the actual | ]4shooter. Defendant also asserts that, even with the recorded statements, the State failed to establish his guilt beyond a reasonable doubt, as all other evidence was circumstantial. Lastly, he contends that the State faded to exclude every reasonable hypothesis of innocence.
Here, defendant was convicted of second degree murder, a violation of La. R.S. 14:30.1. In Louisiana, second degree murder is defined as the killing of a human being when the offender: 1) has specific intent to kill or to inflict great bodily harm; or 2) is engaged in the perpetration or attempted perpetration of one of several enumerated felonies, even though he has no intent to kill or to inflict great bodily harm. See, State v. Lewis, 05-170 (La.App. 5 Cir. 11/29/05), 917 So.2d 583, 589-90, writ denied, 06-757 (La.12/15/06), 944 So.2d 1277.
In this case, the jury was instructed as to both theories: specific intent murder and murder whde committing or attempting to commit an armed robbery. Under the first theory of second degree murder, the State had to prove that defendant had the specific intent to kill or to inflict great bodily harm. Specific intent is “that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” La. R.S. 14:10(1). The determination of specific intent is a question of fact. State v. Durand, 07-4 (La.App. 5 Cir. 6/26/07), 963 So.2d 1028, 1034, writ denied, 07-1545 (La.1/25/08), 973 So.2d 753.
Applying the legal principles to the evidence in this case, this Court finds that the State carried its burden of proving that defendant acted with specific intent to kill or inflict great bodily harm. Specific intent to kill may be inferred from a defendant’s act of pointing a gun and firing at a person. State v. Hoffman, 98-3118 (La.4/11/00), 768 So.2d 542, 585, cert. denied, 531 U.S. 946, 121 S.Ct. 345, 148 L.Ed.2d 277 (2000); State v. Batiste, 06-869 (La.App. 5 Cir. 4/11/07), 958 So.2d 1 24, 27. Defendant admitted, in his statement, that, while seated in the back seat of Mr. Kerner’s taxicab, he pointed a gun at Mr. Kerner and fired it directly at Mr. Kerner.
Additionally, specific intent to kill may be inferred from the extent and severity of the victim’s injuries. State v. Stacker, 02-768 (La.App. 5 Cir. 12/30/02), 836 So.2d 601, 606, writ denied, 03-411 (La.10/10/03), 855 So.2d 327. Dr. Garcia testified that Mr. Kerner was shot twelve times, including a shot to the right side of his head. Further, at least two of his gunshot wounds were fatal. In light of this, we find that a rational trier of fact could have found that the evidence was sufficient under the Jackson standard to find that defendant had the specific intent to kill Mr. Kerner.
Because the evidence is sufficient to convict defendant under the specific intent theory of second degree murder, there is no need to determine whether the State presented sufficient evidence of felony murder. See, State v. Johnson, 11-336 (La.App. 5 Cir. 2/14/12), 91 So.3d 365, 373 n. 12. Thus, there is no need to address defendant’s contention that the State failed *1150 to prove armed robbery. Further, defendant contends, in the same pro se assignment of error, that the State failed to establish that he was the actual shooter. However, his statement admitting that he was the shooter and the circumstantial evidence presented by the State were sufficient to establish that he was the “actual shooter.”
In the last claim regarding the sufficiency of the evidence used to convict him, defendant’s appellate counsel argues that the trial judge erred by denying his motion for new trial based on newly discovered evidence. Counsel contends that, after trial, the defense discovered that, on the day that he was killed, the victim had an appointment in connection with the taxicab corruption investigation at the New Orleans Mayor’s Office of the Inspector General. Defendant asserts that this 1 ^information would have completely changed his defense and affected the jury’s verdict in his favor.
The State responds that the evidence of defendant’s guilt presented at trial was strong enough to support the conclusion that the newly discovered evidence probably would not have changed the verdict. The State further responds that the alleged evidence that the victim had scheduled a meeting with the Inspector General’s office was not material to the issue of defendant’s guilt. Thus, the State contends that defendant has not met the requirement necessary to support a successful motion for a new trial. In any event, the State argues that any error in not introducing this evidence was harmless because it was cumulative.
A motion for a new trial is based on the supposition that injustice has been done the defendant and, unless such is shown to have been the case, the motion shall be denied, no matter upon what allegations it is grounded. La.C.Cr.P. art. 851. La. C.Cr.P. art. 851(3) provides that, on motion of the defendant, the court shall grant a new trial when “[n]ew and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty[.]” State v. Bazley, 09-358 (La.App. 5 Cir. 1/11/11), 60 So.3d 7, 21, writ denied, 11-282 (La.6/17/11), 63 So.3d 1039.
As such, when the motion for a new trial is based on newly discovered evidence, the following four requisites must be met: (1) the evidence must have been discovered since the trial; (2) the failure to learn of the evidence at the time of trial was not due to defendant’s lack of diligence; (3) the evidence must be material to the issues at trial; and (4) the evidence must be of such a nature that it would probably produce an acquittal in the event of a retrial. Id. The trial court’s ruling 117as to whether these requisites are met is entitled to great weight and a denial of a motion for new trial will not be disturbed on appeal absent a clear abuse of that discretion. Id.
Evidence is material only if there is a reasonable probability that the results of the proceeding would have been different if the evidence had been disclosed to the defense. A “reasonable probability” is that which is sufficient to undermine confidence in the outcome of the trial. State v. Johnson, 05-180 (La.App. 5 Cir. 11/29/05), 917 So.2d 576, 579, writ denied, 06-1254 (La.12/15/06), 944 So.2d 1282. In determining materiality, a reviewing court must ascertain “not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.” Id.
*1151 The record reflects that, on June 27, 2012, defendant filed a motion for new trial based on La.C.Cr.P. arts. 851(3) and 853. In that motion, defendant argued that he had discovered new and material evidence, which, despite the exercise of reasonable diligence, was not discovered before or during the trial and would probably have changed the verdict. Defendant contended, after trial, the defense learned that the victim was murdered just one hour before he was scheduled to meet with Orleans Parish officials regarding the taxicab corruption investigation. That motion was denied.
On September 12, 2012, a hearing was held on defendant’s second motion for new trial based on newly discovered evidence. At that hearing, defense counsel produced a newspaper article quoting the victim’s sister stating that the victim had an interview scheduled with the Inspector General’s Office approximately one hour after he was killed. Defense counsel contended that Ms. Kerner’s statement would have supported the defense’s argument that the victim was murdered |1sbecause he was a whistleblower in the taxicab bureau investigation. Defense counsel presented a letter from the Inspector General’s office advising they were not able to confirm or deny any appointments due to the ongoing investigation.
The prosecutor responded that this issue was covered extensively during trial and was not a basis for a new trial. After listening to arguments of counsel, the trial judge denied the motion, because there was ample evidence that defendant committed the murder, notwithstanding these allegations. Defense counsel objected.
Upon review, we find that the trial judge did not err by denying the motion for new trial based upon newly discovered evidence because the mover failed to meet the four requisites necessary for a new trial. First, it is unclear if the victim had an appointment at the Inspector General’s Office because the statement by the victim’s family member was not corroborated. Second, even if the appointment was discovered after trial and the failure to learn of that appointment before trial was not due to lack of diligence, we cannot say that the fact that the victim had an appointment was material to defendant’s guilt or that further information on that appointment would produce an acquittal in the event of a retrial.
Thirdly, the evidence against defendant was overwhelming. The call for the cab was made from defendant’s cell phone. Defendant gave the dispatcher an address on his grandmother’s street. Defendant’s DNA was on a motorcycle helmet and gloves he left in the victim’s cab. Defendant’s fingerprints were on the rear passenger side window of the victim’s cab. Most compelling, defendant admitted that he shot the victim instead of paying for his cab ride.
In short, considering the fact that the jury was informed of the victim’s involvement in an investigation into corruption at the New Orleans Taxicab Bureau paired with the overwhelming evidence presented by the State -of defendant’s guilt, |19we cannot say that the defendant established that testimony regarding the victim’s alleged appointment with the Inspector General’s office would have changed the verdict or, in the.event of retrial, produced an acquittal. Accordingly, we find that the trial judge did not err by denying the motion for new trial based on newly discovered evidence.
In conclusion, we find no merit in defendant’s contention that the evidence presented by the State was insufficient to support his convictions for second degree murder and felon in possession of a firearm. This assignment of error lacks merit.
*1152 In his second counseled and sixth pro se assignments of error, defendant argues that the trial court erred in failing to grant a mistrial or failing to seat a new panel of potential jurors, when the potential jurors heard Mr. Kerner’s daughter screaming at Jamario in the courtroom, and when two jurors initially expressed their predisposition to him being guilty prior to trial.
Here, defense counsel argues that the trial judge erred by denying his motion for a mistrial or his request to obtain a new panel of potential jurors, when a jury panel heard the victim’s daughter screaming at defendant. He asserts that the victim’s family was crying and emotional throughout jury selection and that two potential jurors even approached the bench to express sympathy for the family. Defendant contends that a fair trial was highly unlikely since he had to defend against the allegations in this case in front of this emotional backdrop. The State responds that defendant fails to make any reasonable showing that the emotional actions of the victim’s daughter prejudiced him to such a degree that a mistrial was warranted.
First, the record reflects that three of the potential jurors that defendant addresses — Glorioso, Saterfiel, Bowdoin— were not seated on the jury so any outbursts in front of them or prejudice on them part could not affect the jury. UoAccordingly, we will discuss only one of the jurors, Mr. Hartmann, who was selected as a juror.
During voir dire, Mr. Hartmann stated, during a bench conference with the attorneys and the trial judge, that he saw a news report regarding this case two days prior to his call for jury duty. Mr. Hart-mann told the trial judge that he thought he recognized the victim’s daughter and sister in the back, and he was sympathetic to them. However, Mr. Hartmann stated that he could put his emotions aside and require the State to prove each element of the crime beyond a reasonable doubt.
After defendant was convicted, he filed a motion for new trial, arguing inter alia, that the trial judge erred by denying his motion for a mistrial based on the family’s emotional display. At the hearing on the motion, defense counsel argued that mistrial was warranted in this case because the jury was influenced by the emotions of the victim’s family. The prosecutor responded that no jurors who served on the jury were present when the victim’s daughter had an emotional outburst. He argued that there were no other actions by the family that could have been viewed or heard by the jury to prejudice them. Defense counsel countered that if there was even the smallest amount of doubt, it should be resolved in favor of a fair trial.
After listening to arguments of counsel, the trial judge denied the motion for new trial because, to his recollection, none of the seated jurors witnessed the outburst. The trial judge recalled that, when the victim’s daughter had her outburst, court was not in session, all of the prospective jurors except three were outside of the courtroom, and none of those three prospective jurors were selected. Defense counsel noted her objection to the trial judge’s ruling.
According to La.C.Cr.P. art 775, upon the defendant’s motion, a mistrial shall be ordered, and in a jury trial, the jury dismissed, when prejudicial conduct in laiQr outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771. La.C.Cr.P. art. 771 sets forth permissive grounds for requesting an admonition or a mistrial when a prejudicial remark is made on grounds that do not require automatic mistrial under Article 770. State v. Anderson, 46,724 (La.App. 2 Cir. 11/2/11), 78 So.3d 176, 183. A mistrial *1153 is a drastic remedy and, except in instances in which a mistrial is mandatory, is warranted only when trial error results in substantial prejudice to defendant, depriving him of a reasonable expectation of a fair trial. Whether a mistrial should be granted is within the sound discretion of the trial court and the denial of a motion for mistrial will not be disturbed absent an abuse of that discretion. State v. Smith, 04-340 (La.App. 5 Cir. 10/26/04), 888 So.2d 280, 285.
Courts have traditionally upheld denials of motions for mistrial based on emotional outbursts when a defendant fails to show their influence upon the jury prejudiced his right to a fair trial. State v. Chairs, 12-363 (La.App. 5 Cir. 12/27/12), 106 So.3d 1232, 1249. In Chairs, the defendant argued that the trial court should have granted a mistrial based on emotional displays by the State’s victim assistance coordinator, the victim’s father, and several members of the National Guard during the playing of the 911 tape.
The Chairs court found that the display of tears was the natural expression of human emotion to be expected in a case involving the death of a child. /A[5] Furthermore, this Court stated that the trial court had instructed the jury that they were not to be influenced by sympathy, passion, prejudice, or public opinion. Lastly, this Court found that the defendant did not demonstrate, nor did the record indicate, how the display of emotion could have prejudiced him to such a de-greejjgthat a mistrial was warranted. Id. See also, State v. Brown, 96-1002 (La.App. 5 Cir. 4/9/97), 694 So.2d 435, writ denied, 97-1310 (La.10/31/97), 703 So.2d 19.
In the instant case, the only juror at issue did not witness the outburst. Moreover, the outburst in question was the daughter’s natural expression of human emotion to be expected in a case involving the death of her father. See Chairs, supra. Additionally, the trial judge instructed the jury that they were not to be influenced by sympathy, passion, prejudice, or public opinion. See Brown, supra. Lastly, defendant does not demonstrate, nor does the record indicate, how these displays of emotion could have prejudiced him to such a degree that a mistrial was warranted. See Chairs, supra. Accordingly, we find no merit in this assignment.
In his second pro se assignment of error, defendant contends that he told his trial attorneys he wanted to testify at trial, but that they refused to allow him to do so due to his prior felony record. He further contends that there is nothing in the record that shows he waived his right to testify. Defendant claims that his counsel threatened to withdraw from his case in the middle of trial if he continued to insist upon testifying.
A defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense. Rock v. Arkansas, 483 U.S. 44, 49, 107 S.Ct. 2704, 2708, 97 L.Ed.2d 37 (1987); State v. Dauzart, 99-3471 (La.10/30/00), 769 So.2d 1206, 1207. In State v. Hampton, 00-522 (La.3/22/02), 818 So.2d 720, 729, on reh’g, (La.6/7/02) (citing Passos-Paternina v. United States, 12 F.Supp.2d 231 (D.P.R.1998)), the Louisiana Supreme Court set forth the following guidelines to be utilized by the courts in determining whether a criminal defendant’s right to testify has been violated or waived by his silence during trial:
(1) absent extraordinary circumstances that should alert the trial court to a *1154 conflict between attorney and client, the court should not inquire into a criminal defendant’s right to testify. The court should l^assume, that a criminal defendant, by not ‘attempting to take the stand,’ has knowingly and voluntarily waived his right;
(2) the court must consider whether the petitioner has waived his right to testify.... [The defendant can only] rebut that presumption ... by showing that his attorney caused him to forego his right to testify [ (a) by alleging specific facts, including an affidavit by the defendant’s trial counsel] from which the court could reasonably find that trial counsel ‘told [the defendant] that he was legally forbidden to testify or in some similar way compelled him to remain silent ... ’ [(b) by demonstrating from the record] that those ‘specific factual allegations would be credible[.]’
In the instant case, the record does not reflect “extraordinary circumstances” that should have alerted the trial court that the defendant and his trial attorneys had a conflict. The trial court was not, therefore, obligated to inquire into defendant’s decision not to testify. Furthermore, defendant has failed to provide any proof, specifically, in the form of an affidavit from his trial attorney, that his trial attorney told him that he was “legally forbidden to testify or in some similar way compelled him to remain silent.” Thus, the defendant herein has not satisfied either of the Hampton guidelines to establish that his right to testify was violated. Id. Accordingly, this assignment lacks merit.
In his third pro se assignment of error, defendant argues that his trial counsel lacked the proper tools and support for effectively presenting a defense. He contends that the State failed to provide funds for DNA testing on the gun that was seized from the apartment.
The record reflects that, at a hearing on March 22, 2012, the prosecutor informed the trial court and defense counsel that he would not be having the gun found in the apartment tested for DNA. Defense counsel responded that she would inquire of her supervisor whether there were funds available to have the gun tested for DNA.
Ig/The record does not reflect that DNA testing was done on the gun between the hearing and the trial. Further, defense counsel did not raise an objection at trial regarding her inability to present a defense due to the lack of funding for DNA testing of the gun. Without a contemporaneous objection, defendant is barred from raising this claim on appeal under La. C.Cr.P. art. 841.
Moreover, even if we were to address the merits of this issue, we would find no error. In State v. Touchet, 93-2889 (La.9/6/94), 642 So.2d 1213, 1216, the Louisiana Supreme Court held that for an indigent defendant to be granted the services of an expert at the expense of the State, he must establish that there exists a reasonable probability both that an expert would be of assistance to the defense and that the denial of expert assistance would result in a fundamentally unfair trial.
The supreme court found that, to meet this standard, a defendant must ordinarily establish, with a reasonable degree of specificity, that the assistance is required to answer a substantial issue or question that is raised by the prosecution’s case or to support a critical element of the defense. It further found that if the trial court finds that the indigent defendant is able to meet this standard, it is to authorize the hiring of the expert at the expense of the State.
*1155 Here, it is unclear how DNA testing of the gun would be of assistance to the defense. Touchet, supra. A defendant must ordinarily establish, with a reasonable degree of specificity that DNA testing of the gun was required to answer a substantial issue or question raised by the State’s case or to support a critical element of the defense. Id. Here, ballistics testing proved that the gun found in the closet was not the murder weapon. The gun was introduced to prove that defendant, who was a convicted felon, possessed a firearm. Here, it is difficult to see how DNA testing of a weapon would support a critical element of the defense |2ssince DNA testing could not exclude defendant as a possessor of a firearm. Accordingly, we find that this assignment of error lacks merit.
In his fourth pro se assignment of error, defendant argues that due process of law was violated where defendant was subjected to an unreasonable arrest. Defendant contends that the affiant, in his affidavit in support of the arrest warrant for Jamario Alexander, “presented false and misleading information that were [sic ] contrary to the facts and evidence presented at trial.”
In this assignment, defendant challenges the validity of the arrest warrant. The record does not reflect that defendant filed a motion to quash or objected to any error relative to the arrest warrant in the trial court. Thus, the issue has not been preserved for appellate review. See La. C.Cr.P. art. 841(A); La.C.Cr.P. art. 521; La.C.Cr.P. art. 531 et seq.; State v. Howard, 11-1155 (La.App. 5 Cir. 5/22/12), 91 So.3d 564, 569-70, reh’g denied (7/19/12).
In his final pro se assignment of error, defendant argues that “the out-of-court identification procedure is constitutionally [inadequate to be admissible in court and ... the in-court-identification [sic], under the totality of the circumstances is [unjreliable.” Defendant argues that Shawn Deggins’ identification of another man as the perpetrator of the shooting is constitutionally unreliable because of slight inconsistencies, regarding his whereabouts when he heard the shots, between his statement to the police and his testimony in court.
First, this issue is properly raised in a pre-trial motion to suppress pursuant to La.C.Cr.P. art. 521. Although defendant did initially move to suppress his “identification,” during the suppression hearing, defense counsel withdrew the motion as moot. Because this issue was not ruled on by the district court, it was not preserved for review. State v. Langley, 10-969 (La.App. 3 Cir. 4/6/11), 61 So.3d 747, 780, reh’g denied (5/11/11), writ denied, 11-1226 (La.1/20/12), 78 So.3d 139, cert. denied, — U.S. -, 133 S.Ct. 148, 184 L.Ed.2d 73 (2012). Furthermore, even if this matter were ripe for review, the witness that defendant challenges did not identify him, but rather identified another man, so it is unclear why defendant would challenge the reliability of this witness.
More importantly, at trial, defense counsel elicited testimony on this issue so the jury heard this information and still found defendant guilty as charged on both counts. As already noted, the credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; the credibility of the witnesses will not be reweighed on appeal. State v. Rowan, 694 So.2d at 1056. Accordingly, this assignment of error lacks merit.
Defendant requests an error patent review, which this Court routinely executes in accordance with La.C.Cr.P. art. 920. The review reveals one error, which we decline to correct.
*1156 La. R.S. 14:95.1(B) mandates that an offender convicted of being a felon in possession of a firearm pay a mandatory fíne of not less than $1,000.00 nor more than $5,000.00. However, the trial judge did not impose a fine in this case, which makes defendant’s sentence illegally lenient. This Court has authority to correct an illegally lenient sentence under La. C.Cr.P. art. 882. Because defendant is indigent, we decline to exercise our authority to correct defendant’s illegally lenient sentence by remanding for imposition of the mandatory fine. See, State v. Gorman, 11 — 491 (La.App. 5 Cir. 2/14/12), 88 So.3d 590, 600.

Conclusion

Based on the foregoing, we find no error in the proceedings leading to defendant’s convictions and sentences. Accordingly, defendant’s convictions and sentences are affirmed in all respects.

AFFIRMED

. After viewing a photographic lineup, Mr. Deggins positively identified a man named Terrance Jones as the man he saw running away from the scene. Mr. Jones lived at 4121 d’Hemecourt, the address to which the cab was dispatched. Mr. Jones testified at trial that he was on home incarceration and had not left the house that day. Tyree Mason, Terrance Jones’ stepson, agreed that Jones was home all day. Mason explained that he was home all day except, for about an hour, when he took his sister to school around 8:00 a.m. Investigators eventually ruled out Terrance Jones as a suspect.

. Two other witnesses, Joseph Ross and Gwendolyn Miles, testified that they heard gunshots and saw an individual, who was wearing dark clothing, running through the Castlewood Village apartments complex. Mr. Ross also remembered that the fleeing man wore a backwards teal and green baseball cap, with writing on the front.

. See Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); State v. Harper, 430 So.2d 627 (La.1983); State v. Evans, 97-1030 (La.App. 5 Cir. 4/15/98), 712 So.2d 941, 944 writ not considered, 98-2088 (La.12/18/98), 731 So.2d 276.

. Dr. Garcia recovered one projectile from the victim’s thigh, which accounts for the lack of a twelfth exit wound.

. Chairs, supra, citing State v. Wessinger, 98-1234 (La.5/28/99), 736 So.2d 162, 183, cert. denied, 528 U.S. 1050, 120 S.Ct. 589, 145 L.Ed.2d 489 (1999); State v. Domangue, 350 So.2d 599 (La.1977); and State v. Hopkins, 626 So.2d 820 (La.App. 2 Cir.1993).